No. 31,101.

NATHANIEL LAWSON and LEE LAWSON, *Appellees*, v. SOUTHERN FIRE INSURANCE COMPANY, *Appellant.*

NATHANIEL LAWSON and LEE LAWSON, *Appellees*, v. MERCANTILE FIRE INSURANCE COMPANY, *Appellant.*

(21 P. 2d 387.)

Opinion filed May 6, 1933.

*Albert Faulconer, Kirke W. Dale, C. L. Swarts,* all of Arkansas City, *W. S. Hogsett, C. L. Smith, R. E. Murray* and *A. C. Trippe,* of Kansas City, Mo., for the appellants.

*W. L. Cunningham, D. Arthur Walker, Fred G. Leach* and *Wm. E. Cunningham,* all of Arkansas City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: These were consolidated actions to recover on two

insurance policies which covered an airplane hangar near Arkansas City which was destroyed by fire.

Plaintiff, Lee Lawson, owned the hangar; his father, plaintiff Nathaniel Lawson, had a mortgage on it. It had been purchased in Texas from the federal government by the Arkansas City chamber of commerce, transported from Texas, and reërected on leased premises near Arkansas City. It had a capacity to house twelve airplanes, with a work shop and repair annex attached thereto. It was insured in various amounts, aggregating $8,000, by different insurance companies. The insurance contracts of present concern, for $2,000 each, were effected in June, 1930. In consideration for this insurance plaintiff paid $8.80 in cash and gave his promissory note for $200 payable in seventy days. This insurance was negotiated between Lee Lawson and Walter Colvin, local agent and representative of defendant companies. Colvin accepted the note for $200, and it was agreed that he should hold the policies until the note was paid. Any other facts which may require attention will be stated as we proceed.

The hangar was totally destroyed by fire on July 6, 1930. Payment of the insurance was resisted by these defendants, and this action followed.

Plaintiffs' respective petitions recited pertinent facts on which to predicate *prima facie* liability. Defendants filed separate answers in which they denied that Lee Lawson was the owner of the hangar, and denied that he had any insurable interest in it. It was alleged that at the time the insurance contracts were effected defendants were not aware that the hangar was on leased premises; that they did not know that the hangar was mortgaged by Lee Lawson to Nathaniel Lawson; that Lee Lawson did not perform the obligations to which he was bound by the terms of the policies and in consequence they never became effective.

Defendants' answers admitted that shortly after the fire their agent was notified of the loss, but that formal proofs thereof had never been made by plaintiffs and that the submission of these had not been waived. It was also alleged that Lee Lawson had misrepresented and overstated the value of the hangar and that defendants had relied thereon.

Defendants also pleaded certain paragraphs of the policies, which, among other matters, provided that the insurance contracts would be altogether void if the insured had concealed or misrepresented

any material fact, or if the interest of the assured was other than unconditional and sole ownership, or if the insured building was situated on land not owned by the insured in fee simple. It was also alleged that Lee Lawson's ownership of the hangar was only conditional; that the Arkansas City chamber of commerce had an interest in it, and that the title and ownership of the hangar was vested in one Thompson, lessor of the aviation field on which the hangar was situated.

Further allegations of the answers were that the premiums on the policies had never been paid; that the policies had never been delivered, and that defendants were not liable thereon.

These actions were begun on August 14, 1931, some thirteen months after the fire. The following day plaintiffs served notice on defendants to take the deposition of Lee Lawson in Arkansas City on August 25, 1931. Counsel for both parties appeared, and Lawson's deposition was begun and continued until the following day, at which time it was completed.

The action came on for trial on April 22, 1932, before a jury. Lawson's deposition was read over defendants' objection. Other oral and documentary evidence was adduced at length by the parties. The jury returned verdicts for plaintiffs for the amounts of the policies in both cases. Motions for a new trial were overruled and judgments entered accordingly.

Defendants appeal, urging various errors which so far as practicable will be noted in the order of their presentation.

1. The first error urged relates to the admission of Lee Lawson's deposition in evidence. They argue that while our code permits depositions of witnesses to be taken, it does not include parties. Under our practice, however, a party may be a witness, and, therefore, Lawson's deposition was as regularly taken as if he had no interest in the litigation. (18 C. J. 611; 4 Jones on Evidence, 2d ed., p. 3620; 2 Bancroft's Code Practice and Remedies, § 1163.) In this case it was peculiarly proper and prudent to take Lee Lawson's deposition. He followed the dangerous vocation of an aviator; after the destruction of his hangar his vocation had taken him to Mexico for a number of months, and when his deposition was taken he was about to set out for California. Defendants argue that it was unfair to take Lawson's deposition so quickly after beginning the action when counsel had not had sufficient time to familiarize themselves with the case so as to cross-examine him thoroughly. However, the

trial did not occur for more than seven months after his deposition was taken, and not during that interval did they discover anything which they might have elicited from Lawson if his deposition had not been taken until some later date. The trial court's ruling on this point was correct.

2. It is next contended defendants' demurrer to the evidence should have been sustained. Various points are argued under this assignment, one of which is that by agreement of plaintiff and defendant's agent, Colvin, the policies were retained by the latter, and were to be thus retained by him until Lawson had paid the note he had given for the balance of the premiums. Defendants argue from this arrangement that the policies were never delivered.

(a) That the instruments never did pass into the possession of plaintiffs was not in dispute; but whether the circumstances under which they were retained by defendants' agent had the legal effect of no delivery is quite a different proposition. Plaintiffs' note was accepted for the unpaid balance of the premiums. Defendants' agent had authority to make that arrangement. The policies recited that they became effective according to their tenor on the dates of their execution. In his daily reports the agent had notified the companies of these particular risks he had obligated them to carry. Under such circumstances it was of no importance that there never was any manual delivery of the policies. (26 C. J. 58.) Indeed it has been held that where a contract of insurance is actually made the insured is bound although the contract itself had never been reduced to writing and no policy executed. (*Wilson v. Insurance Co.,* 90 Kan. 355, 357, 358, 133 Pac. 715.)

(b) The next point urged in support of the demurrer to the evidence is based on the policy provisions that they should be void if the interest of the assured was other than unconditional and sole ownership, and likewise void if the assured had concealed or misrepresented any material fact pertaining to the subject of the contract. Answering the last point first, the record does not show that plaintiff Lawson concealed or misrepresented any material fact relating to the subject of this insurance. He advised the agent that the hangar was on leased ground, and the agent so informed his principals in his daily report. Lawson gave the agent his opinion that the value of the hangar was $12,000 or $13,000, and that he understood that it had cost the government $18,000. Mere opinion and hearsay do not constitute misrepresentation. However, de-

fendants assert that Lawson fraudulently concealed the fact that the chamber of commerce of Arkansas City had sold him the hangar for $800 on five yearly payments of $160, and that he had only paid two of them when the insurance was procured. This bald assertion is a good illustration of the old adage that a half truth is frequently more misleading than a statement which is wholly untrue. Lawson did obtain the hangar on the nominal financial terms just stated, but the principal consideration was that the chamber of commerce wanted to maintain an airport in charge of a practical aviator and airplane mechanic who could furnish the usual services and supplies pertaining to that line of business. Lawson possessed the requisite qualifications and undertook to operate the airport in accordance with the policy dictated by the chamber of commerce. Under these circumstances the significance of defendants' assertion that he concealed the facts touching the cost of the hangar is reduced to zero. But it is insisted that Lawson's ownership of the hangar was only conditional, that by the terms of his contract with the chamber of commerce his full title to the hangar was not to be complete until he had complied with "all the terms and conditions hereof," one of which read:

"Party of the second part, as a further consideration, agrees to keep in force and effect fire, lightning and tornado insurance on said hangar in the full insurable value thereof."

The law appears to be settled that so far as relates to the enforcement of insurance contracts one who has purchased property on an executory contract, although its terms are not yet fully performed by him, is the sole and unconditional owner of it.

In *Phœnix Ins. Co. v. Kerr*, 129 Fed. 723, 66 L. R. A. 569, one of the defenses to the action on a policy of fire insurance covering an elevator which was burned was that the interest in the elevator of Kerr, the insured, was other than that of unconditional and sole ownership. On that point the court said:

"The purchaser of the property, who is in the possession of it under a contract whereby the former owner agrees to sell and the buyer absolutely binds himself to purchase and to pay an agreed price for the property, is almost universally held to be the unconditional owner of it under the clause under consideration, because the loss from any injury or destruction of the property falls upon him. If the owner has agreed to sell and the vendee has agreed to buy on definite terms, the purchaser is the sole and unconditional owner of the property within the true meaning of the clause upon this subject in insurance policies, because the vendor can compel the purchaser to pay for the

property notwithstanding its injury or destruction, and hence to suffer the loss occasioned thereby." (p. 726.)

In *Dupreau v. Insurance Co.*, 76 Mich. 615, 5 L. R. A. 671, it was held:

"A vendee legally in possession under a part-paid land contract, who is legally obligated to pay the balance of the purchase price, and to keep the buildings on the land insured in favor of the vendor, may be said to be the entire, unconditional, and sole owner, within the meaning of a policy providing for such ownership, as a condition to the validity of the policy." (Syl. ¶ 2.)

See, also, *Hankins v. Insurance Co.*, 96 Kan. 706, 153 Pac. 491; *Plotner v. National Fire Ins. Co.*, 118 Kan. 234, 234 Pac. 959; *Arkansas Insurance Co. v. Cox*, 21 Okla. 873, 20 L. R. A., n. s., 775; *Houseman v. Insurance Co.*, 78 W. Va. 203, L. R. A. 1917A 299, 303, 304; Anno.—Insurance—Conditional Sale, 38 A. L. R. 200 *et seq.*; 26 C. J. 174, 175; 14 R. C. L. 1058; Vance on Insurance, 444.

(c) It is also contended that the demurrer to the evidence was good because the hangar was located on ground not owned but merely leased by the insured. The evidence was indisputable that defendants were apprised of this fact, yet they chose to carry the risk. In such a situation they cannot defeat the policies by the mere inclusion of a paragraph in their printed texts that the want of a fee-simple title in the realty would defeat the insurance obligations they had undertaken. It is suggested that Thompson, lessor of the aviation field, is or may have been the real owner of the hangar. The basis for this contention was the testimony of Lawson, in which he said:

"As I understood, if I had gone away and left the hangar, it would have become Mr. Thompson's."

This evidence bore no significance on the question of Thompson's interest in the hangar. While by the ancient rules of law any structure attached to the freehold became part of the realty and the property of the landlord, modern conceptions of law and justice have made vast inroads into that doctrine. In *Farmer v. Golden Rule Oil Co.*, 130 Kan. 803, 287 Pac. 706, the action was for damages to real estate resulting from the removal of a filling station from the premises at the close of the five-year term of lease during which defendant had constructed the filling station. In affirming the judgment for defendant, Mr. Justice Burch, speaking for the court, said:

"As between landlord and tenant the law is extremely indulgent to the tenant with respect to removal of structures annexed for the purposes of the

tenancy. (*Wiggins Ferry Co. v. O. & M. Railway,* 142 U. S. 396.) There is good authority that, under circumstances less cogent than those disclosed by the findings of fact, the law would imply right of removal (11 R. C. L. 1083)." (p. 805.)

In *Ray v. Young,* 160 Ia. 613, 46 L. R. A., n. s., 947, it was held that a frame building covering 30 by 50 feet of space, erected by a tenant on the leased property, which was placed on a cement foundation and was connected by a shed with the building on the lot when the lease was taken, and which was used as a garage and repair shop, could be removed by the tenant at the end of his term as a trade fixture if it could be done without injury to the freehold.

See, also, *Frost v. Schinkel,* 121 Neb. 784, where the right to remove trade fixtures attached to the freehold is exhaustively treated.

(*d*) We think that the hangar was in the nature of a trade fixture, and that Thompson, owner of the aviation field, had no interest in it. In justice to him it should be added that there was no evidence that he ever made any claim to the hangar. It was personal property, and so represented to defendants' agent, and insured as such, and the printed paragraph dealing with a situation where the insured does not have fee-simple title to the realty had nothing to do with these contracts of insurance which covered this hangar. (*Eisman v. Fire Insurance Co.,* 115 Kan. 80, 221 Pac. 1116; Note to *Nance v. Oklahoma Fire Insurance Co.,* 31 Okla. 208, in 38 L. R. A., n. s., 426, 427-430.)

(*e*) The next ground of demurrer urged by defendants relates to plaintiff's omission to submit formal proofs of loss. By the printed terms of the policies the insured was required to give immediate notice to the insurer in writing and follow that with a sworn statement of the pertinent facts within sixty days. This Lawson did not do. He did not have access to the insurance policies so as to be reminded of that requirement. But he did promptly advise defendants' agent, Colvin, of the burning of the hangar. Colvin said:

"I will notify the companies at once. We should hear from them in a short time."

Plaintiff testified:

"At the time I told Mr. Colvin these things, answering these questions, he was making notes of them—I did not at that time have the policies I had gotten through Mr. Colvin.

"At another time when I called at Mr. Colvin's office, I met a man who was a state representative of one of the companies, with offices at Topeka, located in the Insurance building. I don't remember his name—he asked me

how the fire started and I told him I didn't know; he stated he had been out past the field and saw the wreckage—he says it is a total loss, there is no question of that and I asked him if he came around to make the adjustment—he said that the company—it was turned over to an adjusting company, he didn't tell me the name and stated I would no doubt hear from them in a short time—at a later date I called at Mr. Colvin's office and asked him for the policies; he said he had returned them to the home office by instructions from the insurance company.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"I saw this state representative again on my return trip from Kansas City when I went to see the adjusting company; I stopped at Topeka and saw him in his office. I asked him for the policy. He said it had been returned to the home office.    .    .    .

"Q. Did he (Colvin) ever tell you whether he had notified the companies or not?  A. The second time I was up there he said he had.

"Q. Did you understand and believe from what he said and what the state agent said that it was necessary for you to make any further proof—any proof of loss in addition to what you had made?

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. I did not think it was necessary to do anything further."

Colvin, himself, testified:

"Q. After the fire, did you send back to your company these two policies Mr. Lawson has sued on here?  A. I think I sent them back August 9, 1930."

Under not dissimilar circumstances the omission of plaintiff to furnish formal proofs of loss has been held not to defeat the obligation of the insurer. In *Williams v. Fire Insurance Co.*, 115 Kan. 578, 223 Pac. 1090, it was said:

"Defendant now contends plaintiffs did not comply with certain conditions of the policy. Having withheld the policy from plaintiffs after the fire, having denied all liability when plaintiffs were endeavoring to comply with the conditions of the policy, and having stood in its pleading on the facts that no contract of insurance was in existence when the fire occurred, defendant is not privileged to make the contention." (p. 579.)

See, also, *Wilson v. Insurance Co.*, 90 Kan. 355, 357, 133 Pac. 715; and 26 C. J. 378.

Another equally effective answer to the point that the formal proofs of loss were not furnished inheres in the fact that when Lawson notified Colvin of the fire the day after it happened, Colvin assured him that the information he then supplied was "all that is necessary," and that he would "notify the companies at once." Apparently he did, for a state representative of the companies assured Lawson that the matter had been turned over to an adjusting company, and that no doubt he would hear from it in a short time.

Such a course of conduct on the part of defendants' authorized agents, Colvin and the state representative, was bound to throw Lawson off his guard as to the necessity of performing any further requirement specified in the policies not accessible to him, and we think the insurer cannot be permitted to take advantage of plaintiff's omission to supply formal proofs of loss under such circumstances. .

In *Winchel v. National Fire Ins. Co.*, 129 Kan. 225, 229, 282 Pac. 571, it was said:

"Some contention is made that the receiver failed to make sworn proofs of loss as required by the contract. As shown, timely notice was given to the authorized agent of the defendant, who immediately notified the company. It is not denied that this notice was given and received, but it is said that sworn proofs of loss are something more than notice of the destruction of the building; but as the defendant denied all liability for any amount on grounds that the policy had been rendered void, a detailed statement of the loss would have been useless and unavailing. In the agreed facts defendant has stipulated that the insured house was entirely destroyed by fire, in which event the defendant had agreed to pay the entire amount named in the policy. A fuller account of the loss would have served no purpose as it might have done in case of a partial loss. A denial of liability because the policy was void upon other grounds in effect waived the right of the company for sworn proofs of loss."

In 7 Cooley's Briefs on Insurance, 2d ed., 5986, it is said:

"The question as to the effect of statements by an agent is largely one of agency. If a statement that no proofs or notice will be required, or that they need not be furnished within the specified time, is made by a duly authorized agent, the company will be bound, and a waiver of the policy requirements will arise."

In the same volume, 5990, it is said:

"Any note by or conduct of the company which directly prevent the insured from complying with the conditions of his policy as to notice and proofs of loss or which induce him to believe that strict compliance will not be required will operate as a waiver of any default resulting from such acts or conduct."

See, also, 7 Couch on Insurance, § 1560 *et seq.*

3. Other objections to the judgment will have to be summarily disposed of for sheer want of space and time for their discussion. Error does not appear in permitting Lawson ·to testify that in his several conversations with Colvin the latter did not say anything about proofs of loss, but did say, "That is all that is necessary. I will notify the companies at once." No error arose in permitting

Lawson to testify as to the value of the hangar. He was its owner, and it is elementary law that an owner is presumed to know its value and therefore may give such testimony. (1 Wigmore on Evidence, 2d ed., § 716.) The competency of plaintiffs' witness Berry to give his estimate of the value of the hangar was clearly shown. Defendants themselves produced a witness qualified to give such testimony and his evidence was not greatly at variance with that of plaintiffs' witnesses touching the reproductive cost and value of the hangar. No error transpired in refusing to permit defendants' agent Colvin to testify that he knew nothing about the cost or value of hangars, and that he relied on the information given him by Lawson. Were it otherwise the error would not be reviewable because of failure to bring the rejected evidence into the record as the code requires. (*Elliott v. Oil Co.,* 106 Kan. 248, 251, 187 Pac. 692.) Other complaints concerning excluded evidence which was never produced go out of the case under the same rule. Errors and criticisms of the instructions given and refused have been noted with due care, but nothing approaching the gravity of prejudicial error appears.

We have not failed to peruse with care the reply brief filed by defendants, but discern nothing therein to justify further discussion, or to raise any misgiving as to the correctness of the judgments. Both judgments are therefore affirmed.