No. 46,828

Melvin V. Fox and Barbara F. Fox, *Appellants,* v. Fountain L. Wilson and Patricia L. Wilson and E. L. Downard and Freda M. Downard, *Appellees.*

(507 P. 2d 252)

Opinion filed March 3, 1973.

*Raymond L. Dahlberg,* of Great Bend, argued the cause, and *Lee Turner* and *Tom Kelley,* of Turner, Chartered, of Great Bend, were on the brief for the appellants.

*Norbert R. Dreiling,* of Dreiling and Bieker, of Hays, argued the cause, and *Dennis L. Bieker,* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: This case started out as an action to foreclose and cancel a contract for the sale of a ranch, bought by the sellers alleg-

ing default by the buyers. By counterclaim it was converted into, and was basically tried as, an action by the buyers against the sellers for damages for fraud.

The trial court, after hearing eight days of testimony, refused to foreclose the contract and awarded damages to the buyers in the total amount of $181,269.78. The sellers, plaintiffs-appellants, were Melvin V. Fox and his wife Barbara; the buyers, defendants-appellees, were Fountain L. Wilson and his wife Patricia. They will be referred to by name.

In the middle of May, 1968, the Wilsons were the owners of the El Rancho Motel at Pratt, Kansas. They had run the motel for about a year, and weren't doing too well with it. It had taken their life savings to buy it, in the form of their equity in their home and four rental houses in Wichita, or about $23,000. The total price had been $87,500. Repairs and refurbishing were making serious inroads into current operating revenue, and two outstanding loans were proving burdensome. Fountain Wilson, who was about 37 years old at the time, had been raised on a farm. After ten years of factory work, selling insurance and most recently operating the motel, he was looking for a chance to return to the tranquillity of rural life. It was then he came across an ad in the Wichita paper for the "Fox Ranch," a 3840 acre spread in Gove County.

A couple of calls to the listing broker in Dighton brought the news that the seller would consider taking the motel in trade. They also brought a specification sheet, later admitted into evidence as defendant's exhibit 1. Features which subsequently became important were:

"377 acres feed grain base (average 33 bu)"
"Wheat averaged 57 bu. per acre 1967
⅓ of 500 acres fine growing wheat goes"
"ASC Payments about $6,000.00 last year"
"12 wells rebuilt in 1967 with new cylinders. 3 with plastic casings, wells have never been pumped dry."
"30 ft. to water, good prospect for irrigation"
"Cut 22,000.00 bales of hay in creekbottoms, last year"
"Ran 1200 head yearlings—year around"
"Modern improvement. (not extra big tenant house)"
"3 miles to oil field"
"Buyer has option to buy the machinery"

A few days later Wilson and his fifteen year old son were on their way to Gove to meet the broker and see the ranch. Fox wasn't there when they arrived, but the three of them drove around the

place in a pickup truck; because of the weather they did not get out. Wilson learned that the ranch had been "written up" in a farm magazine for its outstanding beef production, and that Fox was selling only because of an injury to his back. The broker impressed upon him the scale upon which Fox operated and his unequalled reputation in the community.

It was a little later that day that Wilson first met Fox. After looking at the growing wheat the party retired to a cafe in Gove, and there discussed the ranch and its potential for some four hours. The asking price, at $115 per acre, amounted to $441,600. Wilson explained that all he had was the motel, which he valued at $100,-000, subject to a $30,000 mortgage. (In fact, this would be the debt after a proposed refinancing.) He would, he said, be entirely dependent on income from the ranch for both living expenses and debt payments of principal and interest; he would have to rent the grassland for cash. Various assurances were given him, most notably that he would have ⅓ of the wheat and the ASC payments for the year, and could count on the yield from the 377 acres of milo—which should be put in right away. Fox promised to look into finding a tenant for the pasture.

The first meeting led to a second a few days later, when the Foxes journeyed to Pratt to look over the motel. They stayed a couple of days looking the place over and discussing terms. Once again it was emphasized that time was running out to get the milo in, and that the crop would be a source of ready cash—if the deal was to be closed it should be done soon.

In addition, Fox reported notable progress in the pasture rental project. Mrs. Fox mentioned a telephone call for her husband, and he remarked, "Oh, I bet that is on the pasture rental. They have really been after me to get that taken care of." It appeared that the Keller brothers, large cattle operators at nearby Oakley, were all set to rent the grassland for $15,000 cash in advance. The only reason Fox hadn't signed them up before was that he thought Wilson should make the agreement directly, if he was going to buy the ranch.

It was during this meeting that the question of machinery came up. Wilson had none, while Fox had that with which he claimed to have been operating. He presented a three page inventory of personal property—machinery, trucks, equipment and supplies—for which he wanted $48,000. This inventory was admitted into evi-

dence as defendants' exhibit 2. Wilson had seen the machinery lined up at the ranch, looking new to his eyes. It had, in fact, been freshly painted in colors to match the manufacturers' original paint. According to Wilson, Fox said it was in tip-top condition and he would personally guarantee every item.

The result of this meeting was an agreement to trade the Wilsons' $70,000 equity in the motel for the Foxes' equity in the ranch. The Wilsons would assume a mortgage to Metropolitan Life Insurance Company of $124,000, leaving a balance of $247,600 due to the Foxes. This was to be paid in annual installments, with the first, in the amount of $15,000, to be made on August 1, 1968, just over two months away. Wilson was also to pay $1,500 for the rent of an additional 480 acres of pasture.

At the same time the Wilsons agreed to buy the inventoried personal property for $48,810, to be paid by assuming Fox's three outstanding notes in the total amount of $37,500 and giving a personal note to the Foxes for the balance of $11,310.

With terms agreed upon Fox went to his attorney, Ray Sloan, of Hoxie, and had him draw the real estate contract. The closing was in Sloan's office on June 3, 1968, some ten days to two weeks after Wilson and his boy first looked the ranch over. The Wilsons appeared without an attorney, looked the contract over for twenty minutes or so, and then all parties signed. According to Wilson, just after signing he asked Sloan about the mineral rights clause in the contract. Upon being told that the Foxes were reserving the reversionary interest in the ½ of the mineral rights then outstanding, he remarked that "That isn't what we had agreed upon." Fox insisted that it *was* their agreement, and Sloan said "I wish you had brought this up before you signed the contract." Sloan confirms that this exchange took place, while Fox at trial had no recollection of it.

There was no further disagreement at the real estate closing, although Sloan observed that Wilson was disturbed about the matter of the mineral rights: "I could tell that from his demeanor but nothing further was said." Wilson hadn't the cash to make the $1,500 pasture rent payment, so a note for that amount was prepared and executed.

At the closing Sloan also suggested that the Fox abstracts should be secured from Metropolitan Life for examination by the Wilsons' attorney, in accordance with the customary provision in the con-

tract. According to Sloan, Fox asserted that since the title had been good enough for Metropolitan to make a loan on there was no point in going to the trouble and expense of having the abstracts sent out for examination. Wilson, who said he had no attorney, acquiesced in this thinking.

The Wilsons and the Foxes proceeded from Sloan's office to the financial institutions holding Fox's notes. The first was the Citizen's State Bank at Grainfield, where the note was for $15,000. There it developed that the bank would take Wilson's note, co-signed by Fox, only if it was payable August 1st. With $15,000 due to Fox the same day Wilson didn't see how he could do it. Fox, he testified, had assured him he would have at least six months on the note, and could renew it then if he couldn't pay. In due course Fox agreed that he would wait for *his* $15,000 payment until the milo crop was sold. This would let Wilson pay the bank from the $15,000 coming in from the Keller brothers' pasture rent. On this understanding the note was signed.

On leaving the bank the group headed for Grinnell. En route Fox explained the insistence of the Grainfield banker on an early maturity. It appeared that the year before he had wanted Fox to make a payment on the principal of the note but Fox, who was angry with him at the time, had told him his wheat crop was hailed out and he couldn't pay. Since that crop had been represented to Wilson as making 57 bushels an acre, or over 26,000 bushels, Fox's tale of deceiving the banker struck Wilson as "peculiar."

At Grinnell Wilson's note for $14,000, secured by certain of the machinery, was substituted for that of Fox in a like amount at the People's State Bank.

They went on to the Tri-County Credit Union, where Fox had a note for $8,500. Fox owed $436.76 in interest, which was added to the principal, so that Wilson signed a note for $8,936.76. The extra $436.76 was to be credited on Wilson's obligation to Fox for the personal property.

The credit union took a security agreement covering a number of items of the personal property. According to the manager, Fox had been in a few days before with a list of these items to make sure they would be acceptable. This list was one page of the inventory of items sold to Wilson. The largest and most important item, in the lender's eyes, was $6,600 worth of shedded hay. The manager asked Fox specifically how the hay was valued, and Fox

said at $20 a ton. This became significant later when the manager and a member of the organization's credit committee went to the ranch to inspect their security. They found at most 60 tons of old, cobweb covered hay, with no evidence that any had been removed. They were looking, of course, for the 330 tons they and Wilson had assumed would be there.

The next day the Wilsons had serious second thoughts. The deal they had made loomed large, and the mineral rights matter and the episode with the Grainfield banker raised doubts in their minds. Mrs. Wilson called Mrs. Fox and wanted to call the whole thing off; Mrs. Fox replied that her husband was on the way to Pratt, and they should talk to him. Fox, on his arrival at the motel, said that after the substitution of notes it was too late to back out. Wilson offered to have a machinery sale, with Fox to pocket any profit or the two of them to split any loss. Fox wouldn't agree to such a proposal. He reassured Wilson about the ranch's income potential by showing him a warehouse receipt for 26,000 bushels of wheat—last year's crop—and a purported copy of his federal income tax return showing a tax liability of $10,000 for that year. (Mrs. Fox was later to testify that she and her husband had never paid any such income tax—the most they had paid during their four years at the ranch was $3,000 one year; the other years it was nothing.)

When the offer to rescind was unavailing the Wilsons prepared to move to the ranch. Wilson and his boy went up about a week later, and found the house uninhabitable. They slept the first night in a shed, and later moved into the trailer which had been described as the "not extra large" tenant house. The entire family, including four children, lived there until some time in August, when they were able to move into the ranch house.

Wilson's first farming job was to get the 377 acres of milo in, as Fox had urged him to do, as soon as possible. As he did so he had considerable difficulty with the machinery breaking down, and found some of the vital parts missing. Nevertheless he managed to get his crop planted, with the aid of his son, in about two weeks of steady work. He then went to the local ASC office to make sure Fox had entered him as the owner of the current wheat crop. There he learned not only that this had not been done, but the vital 377 acre milo allotment had been diverted by Fox into the 500 acres of growing wheat!

There was no alternative but to plow up the milo he had just

planted. This he proceeded to do, although the machinery again wouldn't function and he ended up borrowing a neighbor's tractor and plow.

Another surprise came when, as he was working his fields, a Mr. E. L. Downard approached him and advised that he was the fee owner of the ranch. It transpired that Fox was purchasing the place on a 1964 contract, and still owed Downard and his wife $128,000. Fox had requested Sloan not to mention that fact in his contract with Wilson so as not to "complicate" things.

Additional difficulties began to appear, and Wilson entered into a series of negotiations with Fox with a view to adjusting the sales price and terms of the contract. These negotiations eventually broke down, and on November 20, 1968, the Foxes brought this action to foreclose the contract, basically for the failure of the Wilsons to make the August 1 payment of $15,000.

The Wilsons answered denying default, and counterclaimed for damages and rescission, alleging numerous fraudulent misrepresentations as to both real and personal property. As to their failure to make the August 1 payment, they pointed out that they had been served on July 29 with an "order of attachment" in a Pratt County case, where a broker claiming an exclusive listing of the ranch was suing the Foxes for his commission.

In due course the Downards intervened, seeking to foreclose the contract under which they were selling to the Foxes. Their interests were provided for at a pre-trial hearing on the Foxes' application for a receivership, and they did not participate in the trial itself.

As previously indicated, the trial was largely concerned with the Wilsons' allegations of fraud, although the Foxes' amended reply also alleged misrepresentations by the Wilsons in the sale of the motel. Additional facts are reflected in the extensive findings of the trial court:

### "No. 2

"The plaintiffs have not sustained the burden of proof of any misrepresentations on the part of the defendants in connection with any of the transactions between the plaintiffs and the defendants herein.

### "No. 3

"The court finds from a preponderance of evidence that the plaintiffs made the representations contained in defendants' exhibits 1 and 2, and made the oral representations to defendants at the times and places prior to the sales to defendants of the real estate and personal property substantially as testified to by the defendant Fountain L. Wilson. The court finds the falsity of such

representations from a preponderance of evidence substantially as testified to by the defendant Fountain L. Wilson, and witnesses called by defendants. The Court finds where such representations were false, they were substantial misrepresentations of the quality, condition and value of the real estate and personal property, as well as the quantity of personal property offered for sale, and that the plaintiff Melvin Fox made the misrepresentations knowing they were false and with the intention to deceive and defraud the defendants. The court finds the defendants relying on the representations of the plaintiffs entered into the contracts, exhibit 'A' attached to plaintiffs' petition and defendants' exhibit No. 2, were deceived and suffered damages thereby in not receiving the value justified by plaintiffs' representations if true.

"The evidence shows the defendants relied entirely on the representations of the plaintiff Melvin Fox. Prior to execution of the sales contracts and prior to delivery of possession of the real estate and personal property, the defendant Fountain L. Wilson spent about one and a half hours on the ranch real estate, and that time was spent in the yard and in a motor vehicle riding to and from some farm and pasture land. Mr. Wilson had made no inspection of the machinery or the improvements or the buildings or contents thereof. On that one visit to the ranch land he had only seen some freshly painted machinery and the location of the buildings and other items casually in passing by. Mr. Wilson had no part in furnishing information to attorney, Ray Sloan who drafted the real estate sale contract for plaintiffs, other than supplying the legal description of the Pratt motel and cafe property, which description was attached to the otherwise completed form of the contract when the defendants arrived at Mr. Sloan's office for signing purposes, June 3, 1968. Mr. and Mrs. Wilson had no separate legal counsel. These facts were known to the plaintiff Melvin Fox.

"The defendants Wilson had complete confidence in the representations and integrity of the plaintiff Melvin Fox. The extent of the misrepresentations is shocking, even a misrepresentation of an urgency to complete the transactions in order that defendants could prepare the ground and plant 377 acres of milo under a false representation of an available A. S. C. allotment, which the defendants acted upon to their loss and destruction of the milo crop by order of the A. S. C. office.

"No. 4

"The court finds with reference to paragraph 5 of the real estate contract, exhibit 'A' attached to plaintiffs' petition, that the clause quoted as follows:
   " 'Except First Parties shall convey the mineral interests now owned by them under the Fox Ranch which mineral interest is a one half (½) thereof, and First Parties reserve and not convey the reversionary interest in outstanding mineral interests under said land,'
is contrary to the previous oral agreement of the parties that the defendant purchasers were to receive all minerals including the reversion of term mineral interests outstanding. Said clause was inserted into the written contract by the plaintiff Melvin Fox, through his attorney, Ray Sloan, without the knowledge of the defendants. Mr. Sloan drew the contract as attorney for Melvin Fox from information furnished by Melvin Fox, and Mr. and Mrs. Wilson first saw the contract in Mr. Sloan's office shortly before signing it. The defendant

Fountain Wilson first noticed the clause a few minutes after signing the contract in attorney Sloan's office while all parties were still present and then asked Mr. Sloan the meaning of the clause. Upon Mr. Sloan's oral answer giving the meaning, Fountain Wilson immediately stated that was not our agreement. Thereupon, Mr. Sloan remarked, 'I wished you had told me before you signed,' and the plaintiff Melvin Fox persisted the clause was in accord with the previous agreement.

"The court finds the quoted clause was inserted into the written contract by deception and fraud of the plaintiff Melvin Fox, and by the mistake of the defendants at the time of signing the contract, and the clause should be adjudged void and should be excised from the contract.

"No. 5

"Plaintiffs contracted with defendants for the latter's purchase on June 3, 1968 of the Fox Ranch, the terms of which are set forth in exhibit 'A' attached to the petition, and as modified by exhibit 'B', dated June 5, 1968, and attached to defendants' Answer.

"No. 6

"The Fox Ranch sale contract covered a gross sale price of $441,600.00, being based on 3,840 acres at $115.00 an acre. Of this amount, the defendants assumed responsibility for payment of a $124,000.00 mortgage lien against the land in favor of the Metropolitan Life Insurance Company. Defendants were given an additional credit of $70,000.00 for their equity in the El Rancho Motel and Cafe in Pratt, Kansas. The conveyance of the motel was predicated on an agreed value of $100,000.00, less a $30,000.00 mortgage obligation against same to be assumed by the Fox's. After deduction of the $194,000.00 for the Metropolitan mortgage and the Pratt motel and cafe equity, a balance of $247,600.00 remained on the contract and this was payable in installments as set out in the third paragraph thereof.

"No. 7

"Contemporaneous with the real estate contract and as a part of the overall transaction, the plaintiffs sold the defendants the farm machinery, equipment and personal property identified in the inventory sheet admitted in evidence for a total price of $48,810.00 This was to be paid through the assumption by the defendants of three Fox notes at the Grainfield and Grinnell banks and the Tri-County Credit Union of Grinnell in the sum of $37,500.00, plus a note for $11,310.00 and security agreement (Plaintiffs' exhibit #18) on a part of said personal property given by defendants to the plaintiffs.

"No. 8

"On June 3, 1968, the fee title to the Fox Ranch was still in E. L. Downard. Plaintiffs possessed nothing more than an equity and contract right for the purchase of same in accordance with the terms set forth in written agreement between the Downards, as sellers, and the Fox's, as purchasers, dated June 3, 1964, copy being attached to the Downard Intervenor's petition.

"No. 9

"Plaintiffs affirmatively concealed the true status of the title to said ranch from the defendants, including the Downard role therein.

"No. 10

"The fifth paragraph of the contract (Exhibit 'A' attached to petition) between the plaintiffs and defendants required each of the parties to furnish an abstract of title showing marketable title to the real estate to be conveyed by each of the parties, or showing such party to be in a position to convey marketable title when called upon under the terms of said contract.

"No. 11

"The plaintiffs were unable, until November 17, 1969, when they complied with this court's order on the intervenor's petition, to show a marketable title. Until that time two major title defects affected materially the plaintiffs' ability to achieve marketability:

"A. From July 28, 1968, to January 13, 1969, (date of delivery of vacation of attachment order to defendants), the defendants were prohibited from making any payments under this contract to plaintiffs by order issued in Case No. 10,254 in the case of Cossell Realty v. Melvin V. Fox, in the Pratt County, Kansas District Court.

"B. From January 13, 1969, to November 17, 1969, the record showed a contract foreclosure action herein by E. L. Downard and wife against the Fox's relative to the contract for the purchase of the Fox Ranch by the Fox's from the Downards.

"During those periods the title of the plaintiffs to the Fox Ranch was not marketable and the plaintiffs gave defendants no reliable indication they could or would make same marketable. Thus, defendants owed no duty of performance on said real estate contract during said interim, and no interest accrued against the defendants during that time on the defendants' obligations to the plaintiffs.

"No. 12

"As the misrepresentations of plaintiffs hereafter noted became evident, the necessity for delivery of abstract exhibiting marketable title became a reality. Request for abstract was made by Attorney Corwin Spencer for the defendants in July, 1968. No abstract was tendered or delivered by plaintiffs before suit was filed in November, 1968. The Answer of defendants, as well as the statements of their counsel in open court at the receivership hearing on January 15, 1969, reiterated demand for abstract. None was delivered until August 13, 1969. When delivered the abstract showed no probability of marketability because of the pendency of the Downard contract foreclosure proceedings. The situation reflecting non-marketability of title continued until November 17, 1969. During this period defendants owed plaintiffs no duty of performance or payment on the real estate contract. Interest and insurance premiums are not chargeable to defendants prior to November 17, 1969.

"No. 13

"Defendants have elected to stand on the contract and rely on the court for damages, instead of requesting rescission herein, for the reason that the events surrounding the transactions between the parties have made impossible a fair return to the status quo enjoyed prior to June 3, 1968.

"No. 14

"The plaintiffs intentionally and materially misrepresented three prospects for early income from said ranch. Defendants relied thereon to their detriment. Defendants knew plaintiffs were without assets other than their equity in the Pratt motel and cafe. Plaintiffs urged successfully an early execution of the real estate purchase contract under the misrepresented necessity for early seeding of the 377 acres of milo under the authority of the ASCS feed grain base allotted to the Fox ranch. Defendants planted the milo shortly after purchase of the ranch only to be informed by the ASCS that the Fox's had diverted the entire 377 feed grain base to an increased wheat acreage and that the milo so planted must be destroyed. The average milo yield on this ranch was 33 bushels per acre. This was at least an average year. The market was $1.00 per bushel. Thus, defendants lost $12,400.00 milo income from this deception of the plaintiffs.

"No. 15

"Plaintiffs had assured defendants the Keller Brothers stood ready to consummate a season pasture rental arrangement calling for a $15,000.00 advance payment. Defendants found this to be untrue after they moved to the ranch and inquired of the Kellers. The plaintiffs advertised and represented to defendants that the prior year's ASCS farm program payments were about $6,000.00. The truth was that those program payments were only $3,778.97, a difference of $2,211.03. Defendants had relied on plaintiffs' representations relative to same and had even negotiated with Mr. Sutcliffe at the Grainfield Bank on that basis. The Keller pasture rent was to care for the Grainfield Bank note of $15,000.00 due August 1, 1968. The $12,440.00 milo crop income and the ASCS money was to more than cover the first installment due the Fox's on the real estate contract, as well as the $1,500.00 pasture lease note. The loss of this income placed the defendants in unexpectedly difficult financial straits in said ranch operation from the beginning, a fact reasonably to be foreseen by the plaintiffs when they misrepresented each of said situations.

"These misrepresentations by plaintiff Melvin Fox, relied on by the defendants, were material inducements to defendants to purchase. However, only the milo item should be separate items of damage.

"No. 16

"The plaintiffs admitted at the trial the following credits be given the defendants: (1) $2,311.20, representing accrued interest due Metropolitan Life Insurance Company on its said mortgage for the period from the February 1, 1968 due date to the June 3, 1968 contract date, this being the obligation of plaintiffs because the real estate contract called for defendants' assumption of $124,000.00 obligation, and no more, to Metropolitan. (2) A $436.76 credit, representing accrued interest owing by the plaintiffs to Tri-County Credit Union on an $8,500.00 note on June 3, 1968, and which interest was added, at the request of plaintiffs, to the note assumed by the defendants, and on the plaintiffs' promise to grant equivalent credit for same on the real estate contract. (3) A Pratt cafe food stock inventory credit of $396.89.

"In addition, the evidence shows defendants to be entitled to an additional credit of $544.93 representing their equity in the Pratt motel vending machines and for which plainitffs agreed to give defenants credit.

## "No. 17

"The plaintiff Melvin Fox misrepresented the personal property set out in defendants' exhibit # 2 as all in good operable condition and priced each item on that basis. The machinery, personal property and equipment set forth in plaintiffs' inventory sheet and sold the defendants for $48,810.00 was grossly and knowingly misrepresented. Plaintiffs willfully concealed the inoperability of much of the machinery, completely aware it was not fit for the purposes represented. The age and models of various machinery items was knowingly misrepresented. There were numerous shortages. The evidence indicates that said personal property had a maximum fair market value on June 3, 1968, of $22,170.00. Jim Losey, a neighbor familiar with said property, valued it at only $15,000.00. The difference between the plaintiff's pretended value and the fair market value was the difference between $48,810.00 and $22,170.00, or $26,640.00, which last figure represented an unjust enrichment of the plaintiffs as a result of a planned fraud on defendants and defendants should recover the same from plaintiffs.

## "No. 18

"The real estate contract of June 3, 1968, was preceded by and accompanied with fraud on the part of the plaintiffs. Melvin Fox's oral representations pertaining to irrigation possibilities as testified by defendant Fountain Wilson as well as the reference to irrigation on defendants' exhibit #1, were untrue as shown by a preponderance of evidence, and materially misrepresented the quality of the real estate and resulted in failure to deliver qualities on which the price was based. Plaintiffs' witness Pryor acknowledged the existence of numerous items of error and untruth in the Hyames advertising sheet, defendants' exhibit #1. Hyames testified he received his information, as did Pryor, from plaintiff Melvin Fox. The representations on water and irrigation prospects could not have been made except in disregard of all facts about the water situation at that ranch. Downard and Losey testified to a total of over 40 dry holes drilled for water during their years on the ranch. Fox acknowledged no serious irrigation tests or efforts during his tenure. He was familiar with the Losey 1100' well. Pryor said his water maps showed no irrigation prospects. Fox blinded his mind—as he did on other things—to these facts.

"Similarly falsely representing an oil field three miles away and other misrepresentations relied on by defendants resulted in substantial failure of plaintiffs to deliver qualities of the real estate on which the purchase price was based.

"Fox misrepresented the capacity of said ranch for cattle on a year round basis. He claimed 1200 as the figure on defendants' exhibit 1, yet the plaintiffs had no cattle on the ranch from November, 1966, to its sale date on June 3, 1968. He claimed 1183 head for the fiscal year from November, 1965, and about 800 head the previous year. However, the assessment records reported by him fail to show more than 134 head for the calender year 1965 assessment. Plaintiffs' own evidence shows a normal requirement of four acres pasture per head of cattle. The Fox Ranch has approximately 2640 acres of pasture—enough to sustain an average requirement for 660 head. Plaintiff

Melvin Fox acknowledged reliance on an extra section of land to be able to increase his herd.

"Melvin Fox misrepresented his hay production. On defendants' exhibit No. 1, he claimed 22,000 bales of hay the prior year, mainly in the creek bottom land on the ranch. His testimony indicated a change to 1966 for that yield. This was inconsistent with his assertion he pastured and fed 1183 head of cattle on the ranch from late 1965 to November, 1966. Defendants testified that Bernard Otley cut most of the hay, amounting only to 8,000-10,000 bales. Plaintiff was unable to substantiate any 22,000 bale claim.

"The availability of the 377 acre milo base was misrepresented by plaintiffs and the true facts concealed, as aforementioned, from defendants.

"Despite plaintiffs' assertions of a good water supply in all wells, one was dry when defendants moved to the ranch in June, 1968.

"Plaintiffs intentionally misled defendants on the proximity of oil production, claiming a nearness of three miles, when the fact was seven miles, and plaintiff Melvin Fox admitted he regarded a capped, unproductive old test as an oil field.

"Numerous other misrepresentations and duplications arose in the real estate contract. There was a shortage of three boxcars for grain, the two 4500 bushel steel bins were dismantled and unerected, the 40' by 40' shop was a part of the two boxcars used for repair purposes, the tenant house turned out to be the trailer house for which Fox was charging an additional $1100.00 on the personal property inventory, and four stock tanks were duplicated by being charged for again in the personal property inventory. The fence, represented to be good, included at least five miles of old wire and posts of 40 or more years old. The steel posts in the ground were sold again as personal property.

"These, and the other matters testified to, sustain the evidence that plaintiffs knowingly and fraudulently misrepresented the ranch so sold the defendants to such a material degree that its represented value bore little resemblance to its true market value on June 3, 1968. The plaintiffs had purchased this land in June, 1964, for an average of $75.00 per acre. The court finds from a preponderance of evidence an average fair market value of $90.00 per acre, instead of the pretended $115.00 per acre. This acreage basis for the 3,840 acres conveyed produces a total fair market value for the ranch on June 3, 1968, of $345,600.00 instead of $441,600.00, the difference being damages because of misrepresentation of the real estate, which defendants are entitled to recover. If the factual representations of Mr. Fox had been true, particularly regarding irrigation, oil, haying and grazing possibilities, an average value of $115.00 per acre would have been proper.

"No. 19

"The court finds the defendants suffered damages because of the misrepresentations and are entitled to recover from the plaintiffs as follows:

"Damages from sale of personal property.
(See finding No. 17 above) .......................... $26,640.00

"Damages from sale of real estate.
(See finding No. 18) ................................ $96,000.00

"Damages for 377 acres of milo. (See
finding No. 15) .................................... $12,440.00

"Credits due defendants from plaintiffs,
   agreed upon from the outset:
"Accrued interest on Metropolitan mortgage
   from 2-1-68 to 6-3-68, paid by defendants
   (See finding No. 16) ............................... $2,311.20
"Interest due Tri-County Credit Union on
   $8,500.00 note of plaintiffs added to
   Credits: defendants' note on 6-3-68.
   (See finding No. 16) ................................ $436.76
"Pratt Cafe food stock, 6-3-68. (See
   Finding No. 16) .................................... 396.89
"Pratt Motel vending machines equity,
   6-3-68. (See finding No. 16) ....................... 544.93
"Defendants' three notes to Grainfield and
   Grinnell banks and Tri-County assuming
   indebtedness of plaintiffs of $37,500.00
   in part payment of the personal property
   sales contract, 6-3-68. (See finding No. 7) .............. 37,500.00
"Defendants' two notes to plaintiffs of
   $1,500.00 and $11,310.00 in part pay-
   ment of the real estate and personal
   property sales contract, 6-3-68. (See
   finding No. 7) ...................................... 12,810.00
"Cancellation herewith of above two notes
   and security agreement—subtract ..................... 12,810.00

"Total Actual Damages: ............................... $176,269.78
   "The court further finds the misrepresentations by plaintiffs were substantial
and were knowingly and intentionally made and that the defendants should
recover in addition exemplary damages in the sum of $5,000.00."

The court went on to compute amounts due to the Foxes, to offset
the damages and strike a balance due them, and to provide a revised
schedule of payments which included the privilege of paying
directly to the Downards (the fee owners who had intervened to
foreclose their contract with the Foxes). No one complains about
this exercise of the court's equity power to reform the contracts
under litigation.

Neither do the Foxes contend that the court lacked *power* to
excise the mineral rights reservation clause from their contract
with the Wilsons. Their challenge to this portion of the judgment
goes only to the underlying finding of fraud, as do most of their
other twenty allegations of error.

The basic contention of the Foxes on this appeal is that there
was insufficient evidence of fraud to meet the oft-stated standard

that "One who asserts fraud must prove it by a preponderance of the evidence; such evidence should be clear, convincing and satisfactory. . . ." (*Sipes v. Crum,* 204 Kan. 591, 464 P. 2d 1, Syl. ¶ 3. See also, *In re Estate of Latshaw,* 194 Kan. 747, 402 P. 2d 323; *Reeder v. Guaranteed Foods, Inc.,* 194 Kan. 386, 399 P. 2d 822; *Jones v. Coate,* 180 Kan. 597, 306 P. 2d 148.)

Their position is stated in essence in their brief where they say "The evidence of an alleged intent to deceive is not clear, convincing or satisfactory. Far more plausible explanations were presented to counter each allegation."

The meaning of such phrases as "clear and convincing proof" or "by evidence that is clear, convincing and satisfactory" has plagued this and other courts for many years. The phrases are used largely in cases involving fraud, oral contracts with decedents, actions to reform or set aside deeds or prove lost deeds, and the like, where for one reason or another it is felt that a "mere preponderance" of the evidence is insufficient. We need not engage in an extensive review of the authorities, for that was recently done and the matter was thoroughly threshed out in the two opinions in *In re Estate of Shirk,* 194 Kan. 424, 399 P. 2d 850, and 194 Kan. 671, 401 P. 2d 279.

In the first opinion we noted that "The term 'clear and convincing evidence' is too [e]lusive to be the subject of an exact definition." (Id., 194 Kan. at 429.) We did, however, quote with approval a federal jury instruction that:

". . . by that term is meant the witnesses to a fact must be found to be credible and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order and that the testimony be clear, direct and weighty and convincing, so as to enable you to come to a clear conviction without hesitancy of the truth of the precise facts in issue." (Id., at 430.)

That definition was in line with our earlier approval of a Pennsylvania definition in *Jackman v. Development Co.,* 106 Kan. 59, 64, 187 Pac. 258:

"It is meant that witnesses shall be found to be credible—that the facts to which they testify are distinctly remembered—that details are narrated exactly and in due order—and that their statements are true. . . ."

In the first *Shirk* opinion the standard above formulated was applied to evidence of an alleged oral contract to devise and bequeath a share in a decedent's estate, and the evidence was found wanting.

In denying a motion for rehearing the court expanded upon both the burden of proof and this court's role on appellate review. First:

"It was not the intention of this court to depart from the long established rule that it would not weigh evidence on appeal. We have not done so. In reviewing the record for the purpose of determining whether there is clear and convincing evidence to support the judgment this court does not weigh the evidence. *It considers only the evidence of the successful party* for the purpose of determining whether it is substantial and of that quality required to be clear and convincing." (*In re Estate of Shirk,* supra, 194 Kan. 672. Emphasis added.)

Noting the confusion arising from cases stating that *it is the trial court* that must be satisfied that the evidence is clear and convincing, the court went on to say:

"Perhaps the rule is more completely stated in those cases which hold that it will be presumed in the absence of a showing to the contrary that the trial court applied the proper test as to clear and convincing evidence. (*Kull v. Pearl,* 147 Kan. 329, 337, 76 P. 2d 790; *In re Estate of Sheets,* 175 Kan. 741, 267 P. 2d 962.) If a review of the record discloses *no evidence* of a clear and convincing quality there is a showing contrary to the presumption." (Ibid. Emphasis added.)

Finally, on this subject, the court reviewed the *Jackman* definition quoted above and the holding in that case, and concluded:

"It is clear from the Jackman case that the appellate court examines the record and must be satisfied that the findings of the trial court were supported by a *quantum* of competent and substantial testimony of the *quality* required by the standard of clear, convincing or satisfactory proof." (Id., 194 Kan. at 673. Second italics added.)

Putting it all together we find: (1) The burden of proving fraud is by a preponderance of the evidence; this is a matter of quantum. (2) The character of the evidence required is "clear and convincing;" this is a matter of quality. (3) By "clear and convincing evidence" it is meant that the witnesses shall be found to be credible, and that the facts to which they testify are narrated exactly and in due order. (4) The trial court is presumed to have applied the correct standard in the absence of a showing to the contrary. (5) Such a "showing to the contrary" is made if the record discloses no evidence which could be characterized as clear and convincing; if there is substantial competent evidence of the requisite quality to uphold the findings they will be sustained. (6) In making such a determination this court considers only the evidence of the successful party.

Applying these principles to the record here we have no hesitancy

in finding that the evidence met the "clear and convincing" standard. It is unnecessary to burden this opinion beyond the facts recited and those found by the trial court. There was ample evidence which, if believed, would support each finding of fraud; the Wilsons and their witnesses testified at length and in scrupulous detail. Contrary to the repeated urging of the Foxes, the fact that they had explanations of some of the transactions which would be equally plausible if believed is immaterial to our review. The conviction of the trial court may be gleaned from his findings that "The extent of the misrepresentations is shocking" and that, as to the nonexistent irrigation prospects, "Fox blinded his mind—as he did on other things—to these facts." The trial court's satisfaction with the proof is further demonstrated by his allowance of exemplary damages.

This standard of review, of course, cuts both ways. The trial court, in its finding No. 2, made an express "negative" finding that the Foxes had not sustained their burden of proof as to alleged misrepresentations regarding the motel. In order to upset this finding we would have to find "arbitrary and capricious disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice on the part of the trial judge." (*Short v. Sunflower Plastic Pipe, Inc.*, 210 Kan. 68, 500 P. 2d 39, Syl. ¶ 4.) Suffice it to say we cannot make any such finding from this record.

What has been said largely disposes of this appeal, but the Foxes do raise some subsidiary questions which deserve comment.

First, they would have all of their representations characterized as mere "puffing," being but opinions of value and not statements of fact. This the trial court refused to do, and we agree. The quantity of hay represented by $6,600 at $20 per ton is a fact, and not a question on which reasonable men may differ. The same may be said of the model-year and operability of a piece of machinery, the distance to the nearest oil well, and the number of bales of hay cut in a particular year—to name but a few. There was a certain amount of puffing, to be sure, but it was so interlaced with representations of hard facts as to go far beyond the permissible bounds of bona fide salesmanship, where those facts proved untrue.

Second, they claim the Wilsons had no right to rely on their representations, but were bound to inspect the property before they purchased. As long ago as 1894 this court observed:

"The trend of the decisions of the courts of this and other states is towards the just doctrine, that where a contract is induced by false representations as

to material existent facts, which are made with the intent to deceive, and upon which the plaintiff relied, it is no defense to an action for rescission or for damages arising out of the deceit, that the party to whom the representations were made might, with due diligence, have discovered their falsity, and that he made no searching inquiry into facts." (*Speed v. Hollingsworth,* 54 Kan. 436, 440, 38 Pac. 496.)

As if anticipating the Foxes' present argument that the Wilsons' misfortune is due solely to their naiveté, the court went on to say (Id., Syl. ¶ 2):

"It matters not that . . . the grantee, who has been misled, may be said in some loose sense to have been negligent, for it is not just that a man who has deceived another should be permitted to say to him, 'You ought not to have believed or trusted me,' or 'You were yourself guilty of negligence.'"

We have followed this at least as recently as 1942 (*Martin v. Hughes,* 156 Kan. 175, 131 P. 2d 682). We do not at this juncture care to retreat from that position, or to reestablish the doctrine of *caveat emptor* in cases such as this. See *Williams v. Hanna,* 105 Kan. 540, 185 Pac. 17.

Third, they contend that the allowance of damages for the plowed under milo crop was improper, on the theory that the loss was already reflected in the award for the reduced value of the land. The trial court, in its finding No. 15, singled the milo acreage out from other misrepresentations of anticipated income and allowed separate damages; it did not award separate damages for the $15,000 anticipated pasture rent or for the less-than-expected ASC payments. The basis for this treatment, we presume, was that the diversion of the milo acreage to wheat was a one-time thing; in future years the full milo allotment would be available. In contrast, the other items would be continuing, decreasing the permanent income-producing capacity of the ranch and thus depressing its overall market value. We think the distinction was valid, and that the milo award had the effect of compensating for an immediate out-of-pocket loss which was distinct from any effect it might have had on the market value of the ranch.

Fourth, they contend that the finding of the actual value of both the real and personal property was based on incompetent testimony. As to the personal property, Wilson went over it item by item and fixed values, in a few cases relying on inquiries he had made of dealers. The objections made to this testimony were based largely on relevancy, but value was clearly relevant to the

issue of damages. There could be no serious contention that he, as the owner, was incompetent to express an opinion as to the value of his property. (*Sternbock v. Consolidated Gas Utilities Corp.,* 151 Kan. 81, 98 P. 2d 162; *Lawson v. Southern Fire Ins. Co.,* 137 Kan. 591, 21 P. 2d 387.)

A neighbor, Jim Losey, whose testimony the Foxes object to most strenuously, characterized the machinery as "a whole pile of junk," and fixed its maximum value at $15,000. The trial court, while remarking on this testimony, did not adopt that value in its findings. Its admission was not prejudicial error.

As to the real estate, Wilson testified to a value of $80 to $85 per acre. Downard, the fee owner, fixed the value at $85 to $95 per acre. Losey, who had sold the ranch to Downard and whose father had owned it before him, valued it at $75 per acre. Wilson as owner and the others as former owners and neighbors were all thoroughly familiar with the ranch and were competent to testify as to its value. (*State Highway Commission v. Lee,* 207 Kan. 284, 485 P. 2d 310; *Urban Renewal Agency v. Tate,* 196 Kan. 654, 414 P. 2d 28; *Randle v. Kansas Turnpike Authority,* 181 Kan. 416, 312 P. 2d 235; *Hodges v. State Highway Commission,* 198 Kan. 80, 422 P. 2d 570, and cases cited therein.) The court fixed the value at $90 per acre. While the Foxes' witnesses fixed higher values, the court's determination of actual value was well within the testimony.

On the other side of their argument on damages, the Foxes contend there is no evidence showing what the value of the ranch would have been if all their representations had been true. This, they say, deprived them of the "benefit of the bargain," citing *Walker v. Fleming Motor Co.,* 195 Kan. 328, 404 P. 2d 929; *Perry v. Schoonover Motors,* 189 Kan. 608, 371 P. 2d 152; and *Epp v. Hinton,* 91 Kan. 513, 138 Pac. 576.

Each of those cases stands for the proposition that in a damage action by a purchaser for fraud inducing the purchase, the measure of damages is the difference between the actual value of the property at the time of the sale and the value it would have had if the representations had been true. The Foxes say that, even assuming "actual value" was proved, there was no proof of the other element of the equation, "represented value."

In examining the proposition we start with the fact that it is not the Wilsons who are claiming the "benefit of the bargain,"

*i. e.*, they are not claiming the land for which they agreed to pay $115 per acre would have been worth *more* than that if it had been as represented. That kind of a claim clearly would have required extrinsic evidence of value, and the agreed price would doubtless have been utilized by the Foxes to combat such evidence as indicating a lesser agreed value. In that situation, the "benefit of the bargain" rule comes into its true role, which is to carry out the concept that "A defrauded vendee is entitled to compensation for the contract he thought he was making and any advantage he would have obtained thereunder." (*Walker v. Fleming Motor Co.*, supra, 195 Kan. at 333.) In *Epp v. Hinton*, supra, we noted that in this state the "benefit of the bargain" rule obtains instead of the "out-of-pocket" rule, saying (p. 516):

". . . The latter rule merely *protects the person deceived* from suffering actual loss; the former, which is the settled rule in this jurisdiction, gives him [the person deceived] the benefit of his bargain, and in effect forces the wrongdoer to make good his representations." (Emphasis added.)

In *Trapp v. Refining Co.*, 114 Kan. 618, 220 Pac. 249, a defrauded purchaser of worthless corporate stock sued for and recovered the price paid. It was contended there, as here, that there had been no showing of what the property (stock) would have been worth if as represented. The court held (p. 619):

". . . The rule invoked (that of *Speed v. Hollingsworth*, 54 Kan. 436, 38 Pac. 496) is *for the benefit of the injured party* and the wrongdoer cannot complain because of his being satisfied with the mere return of his money, which is one of the remedies open to him. . . . Moreover the price paid for an article is some evidence of its value for the purpose of assessing damages in such a case as the present." (Emphasis added.)

The latter proposition was approved almost verbatim in *Perry v. Schoonover Motors*, supra, Syl. ¶ 4. See also, Annotation 13 A. L. R. 3rd 881, 889, "Damages—Fraudulent Representation, § 3 (*b*), Proof of represented value; purchase price as evidence."

In this case the trial court, in its finding No. 18, concluded that "If the factual representations of Mr. Fox had been true, particularly regarding irrigation, oil, haying and grazing possibilities, an average value of $115.00 per acre would have been proper." As a basis for this finding it had before it the $115 per acre price agreed upon by Fox and Wilson, a willing seller and a willing buyer—both presumably acting on the assumption that the ranch was as Fox represented it. That, as we have said, was "some evidence of its value for the purpose of assessing damages."

(*Perry v. Schoonover Motors,* supra, Syl. ¶ 4; *Trapp v. Refining Co.,* supra.) Whether a fraudulent vendor may turn the rule into one for his benefit we are not called upon to decide; the Foxes made no attempt to show that the ranch, had it been as represented, would have been worth *less* than $115 per acre. In the absence of other evidence by either party we think the sales price was a sufficient basis for the court's finding of represented value.

Finally, the Foxes contend that exemplary damages were improperly awarded. Such damages, they say, "are not recoverable in absence of actual damages," citing *Reeder v. Guaranteed Foods, Inc.,* supra. What has been said above about actual damages adequately disposes of this argument. On the requisite element of deliberate intent to deceive, the trial court may well have been influenced by testimony of several disinterested witnesses as to Fox's semi-public statements that he had sold the ranch "real good;" that he "had it contracted to where he didn't think the man could make it;" and that "he would be back in August." These and several other statements to the same effect were made on various occasions after the June 3 contract was signed and before August 1. They are readily susceptible to an inference that Fox knew all along that he had put the Wilsons into an impossible financial bind, and that he anticipated from the beginning ending up with both the ranch and the motel. In any event, we cannot say the relatively modest award of exemplary damages was not justified by the evidence.

The judgment is affirmed.

APPROVED BY THE COURT.