No. 47,741

Jackie Gonzalez, *Appellant and Cross-Appellee,* v. Allstate Insurance Company, *Appellee and Cross-Appellant.*

(535 P. 2d 919)

Opinion filed May 10, 1975.

*Fred W. Phelps,* of Topeka, argued the cause and was on the briefs for the appellant and cross-appellee.

*Herbert A. Marshall,* of Marshall, Hawks, McKinney and Hendrix, of Topeka, argued the cause, and *William T. Nichols,* of the same firm, was with him on the brief for the appellee and cross-appellant.

The opinion of the court was delivered by

Foth, C.: Plaintiff Jackie Gonzalez brought this action against Allstate Insurance Company, with whom he had an automobile collision policy, claiming it had defrauded him in repairing his car after an accident. His complaint is that the company, unbeknown to him, had the repair shop substitute used parts for the new ones he thought would be installed. A jury awarded him $1,500 in actual damages and $25,000 in punitive damages.

On Allstate's posttrial motion the trial court set aside the award of punitive damages, finding that plaintiff's evidence fell short of the clear and convincing standard required to prove fraud. It did find it sufficient to establish a contract to repair which was

breached, and permitted the verdict for actual damages to stand. Plaintiff has appealed from the order denying punitive damages; Allstate has cross-appealed from the judgment for actual damages.

The primary question is whether plaintiff's evidence of fraud could reasonably have been found by the jury to have been clear and convincing. Taking that evidence, as we must, in the light most favorable to plaintiff it reveals the following:

On July 8, 1972, plaintiff damaged his 1970 Nova automobile. He called the Topeka Allstate office and was told to call their office in Kansas City. He called the number given him and was told by a man there to get an estimate. He secured an estimate the same day from Larry's Body Shop in Topeka, owned by Larry Purvis. The cost for body repairs and a new radiator was $523.15, plus a windshield for $95.10, or a total of $618.25.

On July 10 he called the Kansas City office again. He told them how much the labor would be and that all parts would be new except for the right front fender. They said "that was okay," but he should get another estimate from the Topeka Chevrolet dealer. He did, and a few days later reported back that the second estimate was some $150 more than Larry's. They said they would call him back.

In about two days they did call him, and the ensuing conversation is the critical piece of evidence in this lawsuit. As plaintiff recounted it:

"A. . . . they said, 'Let's have Larry's Body Shop do the work;' and I contacted Mr. Purvis, the owner of Larry's Body Shop. I told him that they have accepted the estimate, and he told me to have a man from Allstate call him and which I told him that they were going to do it because that's what they said because, we are going to call Larry's Body Shop to tell them they approve the estimate.

"Q. What specifically did they say about Exhibit 1 (the estimate)?

"A. You mean the second time I called I talked to them?

"Q. Yes.

"A. Well, they said, 'Let's have Larry's Body Shop do the repair of the car. We will contact Larry's Body Shop,' and then after that I called Mr. Purvis and told them, told him about it."

On the strength of plaintiff's assurances that Allstate would approve the job Larry Purvis started work on the repairs. He was in the early stages when, on July 17, there appeared on the scene one Ted Lemon, an Allstate claim adjuster from St. Joseph, Missouri. Lemon was handling Allstate's Topeka claims while its Topeka adjuster was on vacation.

Lemon examined the car and prepared his own estimate of what should be done to restore it to its precollision condition. This called for used parts rather than new—in particular a re-cored radiator at $65 rather than a new one at $85, a used fender, and a re-chromed face bar. The windshield was excluded from this estimate since it was a separate loss and would come under plaintiff's comprehensive rather than his collision coverage. Some of the saving on parts was offset by an increase in the labor charge, so that the final estimate came to $511.60, compared to Larry's original $523.15 for the same work.

Lemon and Larry Purvis discussed the revised estimate and Purvis agreed to do the work according to the revision. It was his understanding that Lemon had or would secure an agreement on the changes with plaintiff. (Plaintiff testified that he never heard from Lemon, never talked to him, and never saw him until the day of trial.) After the agreement was reached with Purvis Lemon subtracted from the estimate $50 under the deductible clause of the policy, added $17.50 for towing charges, and gave Purvis a draft for $479.10, payable jointly to him and plaintiff. The windshield was replaced in a separate transaction.

Purvis completed the repairs, and on July 20, plaintiff picked up the car. Purvis had him endorse the draft and sign an Allstate release form. Plaintiff also gave Purvis a check for the $50 deductible, less a credit for towing charges he had already paid. He did not examine the car closely and did not know about the substitution of used parts. That night he had trouble with a water loss from the radiator; the next day, July 21, Purvis remedied this by tightening a hose clamp.

Just when plaintiff discovered the used parts is not clear although he found Lemon's revised estimate in the glove compartment. In any event, on Sunday, July 23, he took the car back to Larry's Body Shop and confronted Purvis. He was accompanied by his uncle, F. G. Manzanares, a Topeka attorney. Purvis then told him about Lemon's visit, and that he thought Lemon had cleared the whole thing with plaintiff.

Plaintiff left the car there and returned with his uncle two days later for a second confrontation, this time with both Purvis and Allstate's Topeka adjuster, Herbert Bolyard. Plaintiff, through his uncle-attorney, insisted that the repairs should have been made with new parts. Bolyard explained that the company had a right under the policy to use used parts, and it was their practice to

use used parts whenever they could. The meeting was inconclusive. Plaintiff left the car there a few more days. Then, because he needed it, he picked it up and started driving it. He continued to drive it until the following May, when he permitted the finance company to repossess it.

In the meantime plaintiff brought this action. He made no claim that Allstate had breached its original contract of insurance with him. (That contract limited Allstate's liability for a partial loss to "what it would then cost to repair or replace the property or part with another of like kind and quality." Used parts would, at least arguably, fulfill Allstate's obligation under this clause.) Rather, his cause of action, particularly the punitive damage claim, was bottomed on fraud.

There were two possible hypotheses under which plaintiff could be entitled to punitive damages. *Hess v. Jarboe,* 201 Kan. 705, 443 P. 2d 294, established that a breach of contract, standing alone, does not call for punitive damages even if intentional and unjustified. But such damages are allowable if there is some independent tort indicating "malice, fraud or wanton disregard for the rights of others." (Id., Syl. ¶ 2.) Under this doctrine plaintiff could recover punitive damages by showing that Allstate, through its Kansas City office, agreed with plaintiff to repair the car with new parts in accordance with Larry's first estimate, and that Lemon knew of the agreement when he surreptitiously arranged for the substitution of the used parts. Lemon's knowledge of the agreement and concealment of its breach would supply the element of fraud. The trial court examined this hypothesis and found plaintiff's evidence that Lemon knew of the alleged promise by the Kansas City office was not of the requisite quality.

The second hypothesis would require a showing that when the Kansas City office agreed to repair with new parts the unknown agent who made the agreement knew that the company never intended to honor such an agreement. This would amount to fraud at the inception of the alleged agreement. Although contractual fraud requires the false representation of a material existing fact, rather than a promise of something to be done in the future, an exception exists when the promissor has no intention of carrying out the promise at the time it is made. Under those circumstances the promissor's intent is the existing fact which is fraudulently misrepresented. See, *Edwards v. Phillips Petroleum Co., 187* Kan. 656, 360 P. 2d 23, and cases cited at p. 660.

We take it that this was really plaintiff's theory. Thus plaintiff's uncle testified that when he complained to plaintiff's Allstate agent about how the matter had been handled, "he said that's the way the insurance companies do work and that we lawyers didn't know anything about insurance." To the same effect he testified that when he confronted Bolyard with the two estimates, 'He said this is the way the insurance company works that they put used parts whenever they can. He either said that they used used parts whenever they can or whenever they can get by with it. I can't remember his precise words, but they tried to use used parts." The thrust of this testimony was to show that using used parts was the company's standard procedure. The inference would be, under plaintiff's theory, that the Kansas City agent knew this when he was telling plaintiff to have Larry's Body Shop do the work.

It may be seen that under either hypothesis it was essential to establish that the Kansas City agent actually entered into an agreement, independent of the insurance contract, that the work would be done according to Larry's original estimate, complete with the new parts it contemplated. It would not be enough to sustain either theory that he merely agreed to repair the car in accordance with the policy, and that Larry's Body Shop would do the work.

Proof of this new and independent contract, like the other elements of fraud, had to be by "clear and convincing" evidence. *In re Estate of Shirk,* 194 Kan. 424, 399 P. 2d 850, on rehearing 194 Kan. 671, 401 P. 2d 279; *Fox v. Wilson,* 211 Kan. 563, 507 P. 2d 252; and cases cited in each. In the first *Shirk* opinion, following our earlier decisions, we said that "The term 'clear and convincing evidence' means that the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the contract must be narrated exactly and in order; the testimony must be clear, direct and weighty, and the witnesses must be lacking in confusion as to the facts at issue." (Syl. ¶ 2.)

It is on this point that plaintiff's proof fell short. The only evidence of what the Kansas City agent told plaintiff came from plaintiff's own testimony, quoted above. Of this testimony the trial court said, "Plaintiff oscillated between the statement that defendant would call to authorize the estimate and the statement that the defendant would merely call to 'have Larry's Body Shop

do the repair of the car.'" There is, as pointed out above, all the difference in the world between these two versions. Under the first there might have been an agreement to use new parts; under the second there was merely an agreement to have Larry's do the work. The latter version was the one given when plaintiff was asked "specifically" what he was told. We do not see how this "oscillating" testimony can reasonably be called clear and convincing under the test laid down in our cases. The facts are not "distinctly remembered," and the "details in connection with the contract" cannot be said to have been "narrated exactly and in order." This is not a matter of reweighing the evidence but of determining whether what evidence there was could reasonably be said to meet the standard required by law. We hold it could not.

It follows that the trial court correctly found that plaintiff did not sustain his burden of proving fraud, and did not err in rendering judgment for the defendant on the punitive damage issue, notwithstanding the verdict.

On its cross-appeal most of Allstate's points deal in one way or another with the issue of punitive damages. In view of our disposition of that issue all such points are moot.

Allstate relies on *Fieser v. Stinnett*, 212 Kan. 26, 509 P. 2d 1156, for the proposition that its release was a complete defense. Such reliance is misplaced. That case follows long-established precedent in holding that a unilateral mistake of fact will not vitiate a release where there is no fraud, duress, undue influence or mental incapacity. The doctrine presupposes that the parties have an equal motive and opportunity to discover the facts. Here, under plaintiff's testimony, at the time he signed the release he had no reason to believe he was not getting what he thought he had bargained for. More importantly, under plaintiff's testimony there was a failure of consideration. He gave the release in return for a repair job with new parts; what he unwittingly received was something less. To him, it was as if the company had stopped payment on its settlement draft. Compare *Reynard v. Bradshaw*, 196 Kan. 97, 409 P. 2d 1011; *Grohusky v. Atlas Assurance Co.*, 195 Kan. 626, 408 P. 2d 697. And see, 66 Am. Jur. 2d, *Release*, § 13; 76 C. J. S., *Release*, § 20. We think the validity of the release was properly submitted to the jury, who resolved the issue against the company.

Although plaintiff's evidence of the terms of the claimed bargain

was not "clear and convincing," it was sufficient to support a finding, by a preponderance of the evidence, that such an agreement was in fact made. Hence there was a submissible jury issue and the trial court did not err in overruling defendant's motion for a directed verdict on the claim for actual damages.

Finally, on the amount of actual damages, there was opinion testimony that making the repairs with used parts instead of new reduced the value of the car by $250 to $300. The difference was largely attributable to the fact that a knowledgeable prospective buyer could more easily tell that the car had been involved in a collision. There was also a claim for unreasonable delay in completing the repairs, valued in the testimony at $10 per day. Under the general verdict rendered there is no way of telling how much, if anything, the jury allowed for this element. Repairs according to the claimed contract were, of course, *never* completed. In addition, the jury was instructed without any objection appearing in the record that "In any event you should award plaintiff such sum as will fairly and adequately compensate him. The amount of the award rests within your said [sic] discretion." The only limit imposed was the $2,000 claimed in the petition. Despite the scantiness of the evidence on actual damages we are not convinced that a remittitur is required.

The judgment is affirmed.

APPROVED BY THE COURT.

FROMME, J., not participating.