No. 50,101

CARL NORDSTROM and CLEO NORDSTROM, *Appellees and Cross-Appellants,* v. JOHN LEE MILLER and MARILEE MILLER; *Appellants,* LEGERE REAL ESTATE & AUCTION CO., INC., and ROBERT LEGERE, personally, *Cross-Appellees.*

(605 P.2d 545)

Opinion filed January 19, 1980.

*R. H. Calihan, Jr.,* of Calihan, Green, Calihan & Loyd, of Garden City, argued the cause and was on the brief for appellants.

*Norbert R. Dreiling,* of Dreiling, Bieker and Kelley, of Hays, argued the cause and was on the brief for cross-appellees.

Lelyn J. Braun, of Braun & Nyswonger, of Garden City, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

HERD, J.: This is an action to rescind a contract for the purchase of real estate on the grounds of fraud and misrepresentation and to recover punitive damages. The defendants counter-sued to foreclose the purchase contract. The trial court rendered judgment for the plaintiffs. We affirm.

Carl and Cleo Nordstrom, plaintiffs, entered into a contract with John Lee and Marilee Miller, defendants, for the purchase of 480 acres of farm land located two miles west and ten miles north of Holcomb in Finney County. The land was described as follows: the Southeast Quarter (SE/4) of Section Three (3), the East Half (E/2) of Section Ten (10), all in Township Twenty-two (22) South, Range Thirty-four (34), West of the 6th P.M., Finney County, Kansas. The purchase price was $480,000.00. Defendants first offered their land for sale during February, 1975. They placed advertisements in the Garden City Telegram and The High Plains Journal, newspapers of wide circulation in the area. Both advertisements represented the land to be irrigated with 14,000 feet of underground pipe. Later, defendants listed the land for sale with Legere Real Estate & Auction Co., Inc. of Hays. Legere described the irrigation potential of the land in its brochure as follows:

"*Cropland:* There are 480 acres of good irrigated land. Out of this, there is approximately 130 acres of wheat, approximately 50 acres of alfalfa, approximately 50 acres of summer fallow. Going to plant 170 acres to milo and 50 acres to corn.

"*Soil Type:* This soil is a Richfield silt loam and Ulysses silt loam. Very deep, nearly level, upland soils with medium and moderately fine textured, surfaces and subsoils. These soils are well drained; permeability is moderate to moderately slow. They have few limitations that restrict their use.

"*Irrigation:* The well located in the Southeast Quarter (SE/4) of Section Three (3), the north well, is 120 ft. deep and pumps 800 G.P.M. This well was drilled in 1971. It has a Layne & Bowler pump on it. The south well located in the East Half (E/2) of Section Ten (10) is 130 ft. deep and pumps 1500 G.P.M. This well was drilled in 1969 and has a Hydro pump. All irrigation motors are on natural gas. One of these is a 428 Ford motor and one is a 262 Allis Chalmers. U.S. gear heads on both wells and the pumps are 8″. High Plains Drilling and Supply of Garden City drilled both of the wells. There is 14000 feet of underground 10″PVC pipe. All of this is layed so as to connect both wells, if need be.

"All of the land is watered from the west side and the water runs to the east. Good slope to the land and it takes approximately 12 hours per run. A run is 120 ft. wide and ½ mile long."

## Its newspaper ad read as follows:

"480 acres of Prime Developed irrigated land located northwest of Garden City in Finney County, Kansas. Two irrigation wells and approximately 14,000 ft. of underground pipe. This land is flood irrigated and all runs are one-half mile long. New Brick 3 bedroom home, 2,000 square ft. with double car garage, also 50´ x 70´ Machine Shed, new.
POSSESSION: To be worked out between buyer and seller.
TERMS: Excellent on this Prime Irrigated Farm.
"THIS IS ONE THAT YOU HAVE TO SEE TO BELIEVE."

Robert Legere, real estate broker with the company, contacted the plaintiffs and showed Carl Nordstrom the farm on November 23, 1975. Nordstrom, in the company of defendants, inspected the buildings, the land and the two irrigation wells. Plaintiffs again viewed the farm on December 15, 1975 with their family, and paid Legere a $15,000.00 downpayment on the land. Thereafter, plaintiffs sold their home and store in Colorado and moved their belongings and a few pieces of farm machinery to the Millers' farm. The transaction was closed on March 2, 1976, by the signing of a formal contract and the payment of an additional $75,000.00.

Plaintiff purchased necessary farm machinery and some gated pipe for use in the irrigation operations on the farm. On March 7, 1976, defendant assisted plaintiff in starting the two pump engines to commence irrigating the land. During the spring of 1976, Nordstrom watered 120 acres of wheat, 50 acres of alfalfa on three different occasions, pre-irrigated 200 acres of milo, and on two later occasions irrigated the growing milo. Nordstrom harvested 6,000 bushels of milo, 5,640 bushels of wheat and 100 tons of alfalfa hay from the farm during 1976.

During the second application of irrigation water to the milo in the summer of 1976, one of the two irrigation wells went dry. Upon further investigation, Nordstrom found there was insufficient available water to supply either well and the farm could no longer be operated as an irrigated farm due to geological limitations, which will be discussed later in this opinion.

Plaintiffs confronted defendants with this information and demanded rescission of the contract and the return of their money. Defendants offered to drill another well at no cost to

plaintiffs, change the structure of payments under the purchase contract and defer the next payment due thereunder. The offer was refused and on August 12, 1976, plaintiffs instituted this action for rescission and damages for misrepresentation and fraud against the Millers and Robert Legere and Legere Auction & Real Estate. The trial court granted a motion for summary judgment as to Legere and the case was tried to the court November 9 - 11, 1977. The court rendered its decision for plaintiffs on April 12, 1978, and ordered rescission of the contract, awarding the plaintiffs $90,000.00 with interest at the statutory rate to accrue as of the date of the order. The request for punitive damages was denied. The Millers appeal. The Nordstroms cross-appeal against the trial court's actions in sustaining the motion for summary judgment on behalf of Legere and Legere Real Estate & Auction Co., Inc. and in overruling the plaintiffs' request for punitive damages.

We will first consider the cross-appeal against Legere Real Estate & Auction Co., Inc. and Robert Legere. Plaintiffs claim Legere fraudulently conspired with Miller to sell the land as irrigated land when in truth it was dry land, incapable of natural irrigation. They claim Legere flatly stated the irrigation water would last a hundred years. They also point out the land was advertised for sale as irrigated land. They claim they were induced to make the purchase by the false and fraudulent representations of Legere and they should be awarded rescission and damages against him. The defendants Legere Real Estate & Auction Co., Inc. and Robert Legere contend all representations concerning the real estate were provided by Miller to Rodney Einsel, a Legere employee. Robert Legere states he used that information in his presentation to Nordstrom and believed it to be true, having no personal knowledge of his own.

The relationship between a principal and a real estate broker is essentially that of agency. *Henderson v. Hassur*, 225 Kan. 678, 683, 594 P.2d 650 (1979); *Marcotte Realty & Auction, Inc. v. Schumacher*, 225 Kan. 193, 589 P.2d 570 (1979); 12 Am. Jur. 2d, Brokers §§ 83, 101, pp. 835, 851. We have held that in order for an agent to be liable for fraud there must be a fraudulent intent to deceive. In *Hussey v. Michael*, 91 Kan. 542, 138 Pac. 596 (1914), we stated:

"Where the owner of land, by misrepresentation as to its character, effects a sale,

agents who have acted for him in the matter are not rendered personally liable to the buyer for the fraud, merely by reason of their having innocently and in good faith repeated to him the false statements concerning the property made to them by the seller." Syl. ¶ 1.

" 'If . . . the agent makes false representations on behalf of his principal honestly believing them to be true, the mental element of fraud is lacking and he is not guilty of fraud and not liable for such, although his principal may have known that such representations were false. In order that an agent may be held liable for fraud there must be some fraudulent intent to deceive, in the circumstances of the particular case.' " p. 543.

See *Langston v. Hoyt,* 108 Kan. 245, 249, 194 Pac. 654 (1921).

The question of Legere's liability for fraudulent misrepresentation arises on his motion for summary judgment. Legere admits he represented to Nordstrom the irrigation wells were good and would last a long time, but claims he was merely reflecting information furnished by Miller. Legere relies on his own deposition and those of John Lee Miller, Marilee Miller, Cleo Nordstrom, Carl Nordstrom, Richard Bennett, Lawrence Jonagan, Ronald Werner and Albert Savalt. After plaintiffs advised the trial court discovery had been completed, the court reviewed the depositions and found no issue of fact remained as to Legere and granted summary judgment.

We have held that summary judgment is authorized if the pleadings, depositions, answers to interrogatories and affidavits, if any, show no genuine issue of material fact remains and a party is entitled to judgment as a matter of law. *Fredricks v. Foltz,* 225 Kan. 663, 666, 594 P.2d 665 (1979). We have also held a party cannot escape summary judgment, if otherwise proper, on the hope further discovery might reveal evidence favorable to his case after he has reported discovery completed. *Johnston v. Farmers Alliance Mutual Ins. Co.,* 218 Kan. 543, 545 P.2d 312 (1976); *Cherry v. Vanlahi, Inc.,* 216 Kan. 195, 531 P.2d 66 (1975); *Gray v. Ray Gill, Frontier Industries, Inc.,* 208 Kan. 95, 490 P.2d 615 (1971); In *Fredricks v. Foltz,* 225 Kan. at 666, we stated:

"An appellate court should read the record in the light most favorable to the party who defended against the motion for summary judgment. It should take such party's allegations as true, and it should give him the benefit of the doubt when his assertions conflict with those of the movant."

An examination of the depositions reveals no issue of material fact remaining as to Legere. All representations made by Legere to Nordstrom were made innocently and in good faith and there-

fore do not amount to fraud. The trial court did not err in granting summary judgment as to Legere and Legere Real Estate & Auction Co., Inc.

The remaining issue is whether plaintiffs sustained the burden of proving fraudulent misrepresentation by the Millers. Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his injury and damage. See *Loucks v. McCormick*, 198 Kan. 351, 424 P.2d 555 (1967); *Shirk v. Shirk*, 186 Kan. 32, 348 P.2d 840 (1960); *Ware v. State Farm Mutual Automobile Ins. Co.*, 181 Kan. 291, 311 P.2d 316 (1957); *McGuire v. Gunn*, 133 Kan. 422, 300 Pac. 654 (1931); *Shriver v. National Bank, et al.*, 117 Kan. 638, 232 Pac. 1062 (1925); *Miles v. Love*, 1 Kan. App. 2d 630, 573 P.2d 622 (1977); *Kiser v. Gilmore*, 2 Kan. App. 2d 683, 587 P.2d 911 (1978); *Goff v. American Savings Association*, 1 Kan. App. 2d 75, 561 P.2d 897 (1977); 37 Am. Jur. 2d, Fraud and Deceit § 12.

We have held fraud is never presumed and must be proven by clear and convincing evidence. *Gonzalez v. Allstate Ins. Co.*, 217 Kan. 262, Syl. ¶ 1, 535 P.2d 919 (1975); *Fox v. Wilson*, 211 Kan. 563, 507 P.2d 252 (1973). The term "clear and convincing evidence" means:

"[T]he witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue." *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 78, 596 P.2d 816 (1979).

*Gonzalez v. Allstate Ins. Co.*, 217 Kan. 262, Syl. ¶ 2; *In re Estate of Shirk*, 194 Kan. 424, Syl. ¶ 2, 399 P.2d 850, *rehearing denied* 194 Kan. 671, 401 P.2d 279 (1965).

"The existence of fraud is ordinarily a question of fact." An appellate court's review "is limited to determining whether the trial court's finding is supported by competent evidence when that evidence is weighed in a manner most favorable to supporting the trial court's determination." *Miles v. Love*, 1 Kan. App. 2d at 631; 37 Am. Jur. 2d, Fraud and Deceit § 487. This court is

"not concerned with the credibility of witnesses or the weight of their testimony, and the trier of facts, not the court of appellate review, has the responsibility of determining what testimony should be believed." *Loucks v. McCormick*, 198 Kan. at 358.

The evidence in this case reveals Miller advertised his land for sale as irrigated land through advertisements of his own and those of his agent for which he is responsible as principal. He obtained the going price for irrigated land - $1,000.00 per acre. Evidence showed dry land was worth around $450.00 - $500.00 per acre. Unrefuted evidence showed the irrigation wells both failed within six months of the effective date of the contract. The record also reveals there remained no sufficient recoverable irrigation water under the Miller land to operate it as an irrigated farm.

Turning now to the final elements needed to establish fraud, we are called upon to determine whether Miller knew the representations he made were false. If not, were the statements made with a reckless disregard for the truth?

There can be no doubt Miller knew his wells were producing from the Niobrara Formation, a limestone deposit known as a chalk aquifer. This formation lays below the Ogallala sand, the aquifer for much of the irrigation water in Colorado, Nebraska, Kansas, Oklahoma and Texas. The Niobrara has no porosity but where it erodes, it is capable of trapping water in cracks and crevices from perculation through a thin layer of Ogallala sand and gravel. If a driller is lucky he can sometimes tap a crack reservoir and obtain production in paying quantities until the deposit is depleted. Since there is no significant recharge and the supply is a subterranean pond, the small ponds, known as "crack wells," usually are short-lived and deplete without warning. This condition exists north of Holcomb where the Miller land is located. There are about 45 irrigation wells in Finney County producing from the Niobrara, most of them short-lived.

John Lee Miller drilled the south well in 1969 and the north well in 1971. Similar wells were going dry in the area. He knew his irrigated farm would be a dry land farm soon. Nonetheless, he advertised the land as an irrigated farm with two wells, pumping 2300 gallons per minute. He later admitted that figure did not represent the current gallonage being produced. The gallonage had decreased by the time the advertisements appeared. There is substantial, competent evidence to show he told Nordstrom the water production was from the Ogallala aquifer, when the source of the water supply was actually the Niobrara.

Defendants next argue even if their representations were untrue, plaintiffs negligently failed to make inquiry about the nature and condition of the irrigation wells and are, therefore, stuck with their bargain. They argue they asked Nordstrom to check the production of both wells with Lloyd Harkness, who drilled the wells. They also argue Carl Nordstrom is a knowledgeable buyer, having had farming and irrigation experience, and he could not rely on Miller's representations.

These arguments are without merit. The evidence is clear, convincing and uncontroverted that Nordstrom had had no experience with irrigation, except one year's work with water which was obtained from a surface reservoir and connecting ditch. Such is not comparable with the facts in the instant case. A subterranean water resource is a complicated geological study about which even the experts know too little. It could not be expected that one with no experience or education on the subject would anticipate or even recognize a problem. In *Wolf v. Brungardt,* 215 Kan. 272, 524 P.2d 726 (1974), we stated:

"Many years ago this court said the modern tendency is to restrict rather than extend the immunity of one who gains an advantage over another by purposely misleading him. [Citation omitted.]

"In *Speed v. Hollingsworth,* 54 Kan. 436, 440, 38 Pac. 496, the court said:

'The trend of the decisions of the courts of this and other states is towards the just doctrine, that where a contract is induced by false representations as to material existent facts, which are made with the intent to deceive, and upon which the plaintiff relied, it is no defense to an action for rescission or for damages arising out of the deceit, that the party to whom the representations were made might, with due diligence, have discovered their falsity, and that he made no searching inquiry into facts . . . .'

"Where one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expedience of the bargain. [Citations omitted.]

"Many decisions of this court hold the law does not deprive a defrauded party of relief because he had opportunity to investigate when his lack of knowledge was such that the investigation would disclose nothing to him. [Citations omitted.]" p. 282.

The trial court found:

"The Nordstroms came from a long ways away. They were strangers in this area. They certainly had no knowledge of the existence of this most unique water

production system called crack wells or production from the niabrara limestone. They have testified that they were told by Mr. Legere that this production was from the Ogallala. I asked him a question about Ogallala and he indicated to me he knew something about Ogallala. They have also testified that he told them that they had water for 100 years. They testified that Mr. Miller told them there were no worries about water; there was good water, no problems, no dry wells around, that there was no drop in the water table. The drop in the water table is not too awfully important when it comes to the crack wells anyhow. I have to determine what the truth of this matter is.

. . . .

"We get down to the basic fact, if the Nordstroms under these circumstances asked either Miller or his agent, Legere, as to this water supply and how long it would last. If they asked those questions they were entitled to receive straight answers, and under all the circumstances I cannot believe that a man with some irrigation farming experience in an area a long ways away, who was putting everything he had, his lifetime's savings, into this kind of a venture, where everything was determined by whether or not those wells kept producing, a man with a farm background, I cannot believe that he did not ask, and I am going to find that he did ask and that he was told that there was ample water, there was water at least until his children were grown, that there were no dry wells around, that there was good water, no problems, that he had no worries about water. I am going to find that these statements told him were material representations, that they were false representations known to be false and that he relied on them, and that he had the right to rely on them, and that he is entitled to relief."

We are in complete agreement with these findings and, after examining the entire record, find there is substantial, competent evidence to support the trial court's conclusion that Miller knowingly and fraudulently misrepresented facts, upon which the plaintiffs had a right to rely and did rely, to their detriment.

Defendants next argue plaintiffs are estopped to rescind because they remained in possession of the land after the suit for rescission was instituted. The applicable rule of law is expressed in *Cleaves v. Thompson,* 122 Kan. 43, 46, 251 Pac. 429 (1926), where we stated:

"Rescission is an equitable remedy designed to afford relief from contracts entered into through mistake, fraud or duress. Ordinarily, the nature of relief asked in such cases must be such as to place the parties in their original situation. Where one with knowledge of facts entitling him to rescission of the contract, afterwards without duress ratifies it, he is not entitled to have it cancelled. Ordinarily an express ratification is not necessary in order to defeat the remedy of rescission. Acts or conduct, inconsistent with an intention to avoid it, or in recognition of the contract, have the effect of an election to affirm it."

See *Garrison v. Berryman,* 225 Kan. 644, 646, 594 P.2d 159 (1979); *Dreiling v. Home State Life Ins. Co.,* 213 Kan. 137, Syl.

¶¶ 4-6, 515 P.2d 757 (1973). In *Beneke v. Bankers Mortgage Co.,* 119 Kan. 105, 107, 237 Pac. 932 (1925), we stated:

"A person fraudulently induced to buy and pay for property delivered to him has two remedies, one legal and one equitable. He may affirm the contract and sue for damages, or he may disaffirm and sue for rescission . . . . Because the remedy by way of damages rests on affirmance, and the remedy by way of rescission rests on disaffirmance, the two are inconsistent and incompatible. Resort to one excludes resort to the other, and in choosing a remedy it is the first decisive step which counts."

The acts of the Nordstroms from the moment they discovered they had been misled are consistent with rescission and restoration to the status quo. Their continued possession of the real estate was dictated by the circumstances. They had sold their former home as the result of the fraud which induced the contract. Therefore, they had no place to go. While laboring under the mistaken belief they had purchased an irrigated farm, plaintiffs harvested the growing wheat, cut the hay, and planted milo. To say they must walk away from the farm and permit the growing crops to deteriorate, is a tortured, irrational interpretation of the rule. They had the duty to do equity, which in this case, involved preventing waste. This they did commendably and they should not suffer or be punished for their actions. We do not find acts or conduct on the part of plaintiffs that will defeat the remedy of rescission. Plaintiff's demeanor was proper under the circumstances and estoppel will not lie.

The trial court then ruled as follows on the question of damages:

"Now with regard to the things that are necessary to restore these parties to their former position under the rescission that's in effect here, we have just concluded a long pretrial conference and, as I understand it, the parties are willing to stipulate and agree that there has been evidence admitted in this case and evidence conceded in the informal pretrial conference which would be sufficient, if the Court believed it, for the Court to arrive at a position that when all of the compensating factors are weighed back and forth, that is, the possession, the farm crops, the time spent, the losses incurred, the use of the land on the other side, the value of the three quarters of land and everything, that they would be in balance. Are the parties able to so stipulate?

"MR. BRAUN: The plaintiff is, your Honor.
"THE COURT: Defendant?
"MR. CALIHAN: The Defendant is, your Honor.

. . . .

"THE COURT: Well, for the record, first, upon the proposition of punitive damages, I think that as a matter of law punitive damages could be awarded in this

case, but when I consider all of the circumstances I do not believe that they should be. Therefore, I am not going to award any punitive damages.

"I have looked over all this evidence and I have heard the stipulations of the parties and I am convinced that when all of the factors are balanced on both sides that the retention of possession as against the use and value of the land and such, that it comes out even, and I am going to hold that the parties can be restored to their previous position by simple rescission based upon the repayment of the $90,000.00. I am going to give judgment for the $90,000.00 as of today, with interest at the rate of 8%. Now the judgment actually will not be entered until the journal entry is filed, but the 8% will start as of today.  . . .

"I am going to order that the court costs be paid by the defendants, and that's going to include the appraisers' fees and Mr. Wallace's fees."

It is apparent from the record that the parties stipulated plaintiffs' 1976 and 1977 farm income resulting from their possession under the contract is to be treated as liquidated damages in lieu of interest or other damages in the event of rescission. We will not disturb their stipulation and the trial court's judgment is affirmed.

As to the question of punitive damages:

"[Punitive damages] are permitted whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy. [Citations omitted.] Such damages are allowed not because of any special merit in the injured party's case, but are imposed by way of punishing the wrongdoer for malicious, vindictive or a willful and wanton invasion of the injured party's rights, the purpose being to restrain and deter others from the commission of like wrongs. [Citations omitted.]" *Newton v. Hornblower, Inc.,* 224 Kan. 506, 525, 582 P.2d 1136 (1978).

*Sanders v. Park Towne, Ltd.,* 2 Kan. App. 2d 313, 318-319, 578 P.2d 1131, *rev. denied* 225 Kan. 845 (1978). See *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70; *Henderson v. Hassur,* 225 Kan. 678, 594 P.2d 650 (1979). Punitive damages are not an automatic, mandatory result even when recklessness is shown, but are awarded in the discretion of the trial court. See *Garcia v. Southwestern Bell Tel. Co.,* 216 Kan. 591, 533 P.2d 1242 (1975). As the trial court stated, this is a case where punitive damages could legally be awarded because of the independent tort of fraud but the court refused to make the award. We have examined the record and the facts of this case, and we find the trial court acted properly in denying the request for punitive damages.

The judgment of the trial court is affirmed.

FROMME, J., not participating.