996 F.2d 311
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 In re Max Gwaine STEELE, Sharon Kay Steele, Larry Dale
Steele, Arlyce June Steele, Steele Cattle, Inc., Debtors,
Max Gwaine STEELE, Sharon Kay Steele, Larry Dale Steele,
Arlyce June Steele, Steele Cattle, Inc., Appellants,
v.
Bill E. MESKER, William F. Klobuchar, John J. Jabara, John
B. Jabara, Appellees.
 No. 92-3235.
 United States Court of Appeals, Tenth Circuit.
 May 27, 1993.
 
 Before McKAY, Chief Judge, HOLLOWAY and BARRETT, Circuit Judges.
 ORDER AND JUDGMENT*
 BARRETT, Senior Judge.
 
 
 1
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 2
 Debtors-appellants appeal the district court's affirmance of the bankruptcy court's decision allowing certain claims by claimants-appellees against debtors' bankruptcy estates. We affirm for substantially the same reasons set forth in the district court's order, a copy of which is attached hereto.
 
 
 3
 This appeal arises from a dispute over proofs of claim filed by claimants in the bankruptcies of the debtors. Debtors objected to the claims filed, and the bankruptcy court held a hearing and took evidence on the claims and objections. The bankruptcy court allowed portions of the claimants' claims, finding that Max and Larry Steele were individually indebted to claimants in the amount of $38,512.97, plus interest. The court allowed a claim against Steele Cattle, Inc., in the amount of $20,530.42.[1] The claims against the Steeles, individually, were allowed based on an indemnification agreement signed by them in relation to a business venture gone sour. The claim against Steele Cattle, Inc., was allowed based on the specific provisions of a guaranty agreement executed by that entity.
 
 
 4
 We review the bankruptcy court's factual findings for clear error. Ames v. Sundance State Bank (In re Ames), 973 F.2d 849, 850 (10th Cir.1992), cert. denied, 113 S.Ct. 1261 (1993). Legal determinations made by the bankruptcy court are reviewed de novo. Id. Both the bankruptcy and district courts set forth the facts in detail, and we will not repeat them here.
 
 
 5
 Debtors' first claim of error is that there is no basis for allowance of a claim against Steele Cattle based on the guaranty agreement signed by that entity. The bankruptcy court found that, pursuant to a guaranty agreement which it executed, Steele Cattle was jointly and severally liable, along with the comakers and other guarantors, for its share of the underlying obligation. Under the guaranty agreement, Steele Cattle agreed to be primarily liable on the underlying note. The bankruptcy and district courts both based their holdings on the terms of the guaranty agreement, and we find no error in the allowance of the alternative claim against Steele Cattle based upon the specific terms of the guaranty agreement.[2]
 
 
 6
 Debtors next contend that the bankruptcy court erred in finding that the indemnification agreement was ambiguous and allowing the admission of parol evidence. The district court found that the bankruptcy court's assessment of the indemnification agreement as ambiguous was correct and, therefore, the admission of parol evidence was not in error. We have reviewed the indemnification agreement, and we agree that the agreement is ambiguous and that the bankruptcy court did not err in admitting parol evidence. We also agree with the bankruptcy court that debtors failed to establish the elements of fraud or misrepresentation in the procurement of the indemnification agreement. See Nordstrom v. Miller, 605 P.2d 545, 551-52 (Kan.1980) (elements of fraud).
 
 
 7
 Finally, we find no merit in debtors' remaining claims. We hold that the district court did not err in finding that the record contains no evidence of prejudice by the bankruptcy court against the debtors, and that the bankruptcy court did not abuse its discretion in refusing to admit certain evidence. Further, the bankruptcy court was correct in its application of the burden of proof as to the claims filed, and there was sufficient evidence to support the bankruptcy court's allowance of the claims against the various estates.
 
 
 8
 Claimants' request for sanctions including reasonable attorney's fees is DENIED. The judgment of the United States District Court for the District of Kansas is AFFIRMED.
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF KANSAS
 
 9
 IN RE: MAX GWAINE STEELE and SHARON KAY STEELE, Debtors.
 
 
 10
 IN RE: LARRY DALE STEELE and ARLYCE JUNE STEELE, Debtors.
 
 
 11
 IN RE: STEELE CATTLE, INC., Debtor.
 
 Nos. 91-1384-K, 91-1386-K, 91-1387-K
 May 29, 1992
 MEMORANDUM AND ORDER
 
 12
 The present action concerns a disputed proof of claim in the bankruptcy proceedings below. The appellants contend that the bankruptcy court erred in finding that a portion of the claims advanced against them were valid. On May 19, 1993, the parties presented to the court oral argument relating to the appeal. Consistent with the statements of the court at that time, and for the reasons expressed herein, the court hereby affirms the decision of the bankruptcy court.
 
 
 13
 In reviewing the findings of the bankruptcy court, this court may set aside findings of fact only if they are clearly erroneous. Conclusions of law, of course, are subject to de novo review. In re Blehm Land & Cattle Co., 859 F.2d 137 (10th Cir.1988); In re Herd, 840 F.2d 757, 759 (10th Cir.1988).
 
 
 14
 The claim arises from an indemnification agreement signed by Larry and Max Steele on February 17, 1987 in connection with their investment in a defunct cattle marketing scheme. The lean meat marketing scheme found its original incarnation in Nutri-Tech Way, Inc. Nutri-Tech was an Oklahoma corporation in the business of marketing meat with a lower than normal fat content. The sole shareholder of the company was Garry Stephenson. Although Nutri-Tech had an existing network of customers in July, 1986, the company was losing money and having difficulty in meeting its payroll.[1]
 
 
 15
 Bill Mesker and William Klobuchar (who had no prior experience in the cattle industry) were the driving force behind the formation of Tend-A-Lean. It was their intent to form the company to preserve Nutri-Way's existing customer network.
 
 
 16
 Tend-A-Lean was incorporated by Mesker, Klobuchar, and Stephenson as a Kansas corporation on August 28, 1986. The company was designed to carry on Nutri-Way's lean beef concept. The first meeting of the incorporators and the first meeting of the board of directors (once Mesker, Klobuchar, and Stephenson named themselves as directors) was held on September 23, 1986.
 
 
 17
 At this meeting, Mesker and Klobuchar then purchased 1500 shares of Tend-A-Lean stock for $15,000.00 each. Stephenson executed a promissory note in that amount in exchange for a similar number of shares, as did another investor, Kenneth Youngblood.
 
 
 18
 Mesker, Youngblood, and Stephenson discussed investing in Tend-A-Lean in a December 5, 1986 meeting with Larry and Max Steele. The Steeles had heard of the lean beef concept from Gerald Cowel (a mutual friend of Mesker and the Steeles) and were interested in the subject. Larry and Max decided to invest in the company and became shareholders in Tend-A-Lean three days later, with each brother purchasing 750 shares in the corporation. Both brothers served as directors of the corporation, and on March 26, 1987, Larry was elected secretary/treasurer of the corporation.
 
 
 19
 During the period after its incorporation, Tend-A-Lean continued to operate from its offices in Oklahoma. On November 12, 1986, John and Brad Jabara had jointly purchased 1500 shares of Tend-A-Lean. Thus, by the end of 1986, the principal owners of Tend-A-Lean, and the amount of stock controlled by each, may be shown as follows:
 
 
 20
 Mesker 1500
 Klobuchar 1500
 Stephenson 1500
 Youngblood 1500
 John & Brad Jabara 1500
 Larry Steele 750
 Max Steele 750
 
 
 21
 On February 17, 1987, the Tend-A-Lean shareholders met in Wichita, where all shareholders executed an indemnification agreement.
 
 
 22
 Stephenson and Youngblood were subsequently fired for converting corporate property. Youngblood has since vanished; Stephenson has died.
 
 
 23
 The parties dispute the nature and circumstances of many of the transactions in which funds were allegedly advanced to Tend-A-Lean (or its predecessor, Nutri-Tech). The history of these transactions fully supports the bankruptcy court's observation:
 
 
 24
 Although none of the parties in this contested claim objection is a neophyte in business, the business transactions involved are remarkable for their lack of documentation, attention to legal formalities and common sense. Money, assets and liabilities appear to have been transferred from one legal entity to another almost as if by magic.
 
 
 25
 (Slip op., at 3-4.)
 
 
 26
 On August 4, 1986, Mesker and Klobuchar took out a $10,000.00 loan in the name of Nutri-Tech Way. The loan was for the purchase of cattle and other operations at Nutri-Tech. On August 21, they borrowed an additional $25,000.00 on behalf of Nutri-Tech. These loans were later consolidated into a $35,000.00 note. Although all of the funds had been advanced to and on behalf of Nutri-Tech, when the note was renewed on January 21, 1987, it was renewed in the name of Tend-A-Lean rather than Nutri-Tech.
 
 
 27
 In September, Mesker used $850.00 of his personal funds to open a checking account for Nutri-Tech at the Andover National Bank. On September 11, 1986, Mesker and Klobuchar took out a $56,000.00 loan in their own names, using the funds to operate Nutri-Tech. Neither the $35,000.00 nor the $56,000.00 was ever assumed by Tend-A-Lean.
 
 
 28
 On September 3, 1986, Mesker advanced $12,308.64 to Tend-A-Lean for the purchase of cattle from Dale Dicke. The proceeds from the eventual sale of the cattle were retained by Tend-A-Lean.
 
 
 29
 Klobuchar loaned Tend-A-Lean $24,426.31 on October 14, 1986 for the purchase of cattle. The proceeds from their sale were also retained by the corporation and funds advanced were not reimbursed to Klobuchar.
 
 
 30
 John Jabara loaned Tend-A-Lean $60,000.00 in November, 1986, and $50,000.00 in February, 1987. These loans all went to benefit Tend-A-Lean.
 
 
 31
 Steele Cattle wired $42,006.00 to Tend-A-Lean's Oklahoma City bank account on December 31, 1986. The funds were for the purchase of cattle. The bankruptcy court determined that these funds were eventually reimbursed to Steele Cattle.
 
 
 32
 More funds were advanced to the company during 1987. On February 5, Tend-A-Lean established a $130,000.00 line of credit at the Tribune Bank. A promissory note in that amount was executed by Tend-A-Lean, and by Mesker, Klobuchar, Stephenson, and John Jabara individually. Youngblood, Brad Jabara and Steele Cattle, Inc. guaranteed the line of credit.
 
 
 33
 On February 18, Mesker advanced $40,000.00 on the basis of Larry Steele's representations that the company had overextended itself beyond the $130,000.00 limit. He advanced a further $52,266.72 for the purchase of cattle for Tend-A-Lean. Mesker was not reimbursed and the proceeds from the resale of the cattle were retained by Tend-A-Lean. However, at various times, Mesker obtained a total of $33,550.00 from the corporation.
 
 
 34
 The February 5 note at the Tribune Bank matured on August 5, 1987 and was not renewed. A renewal note was prepared which would have rolled the debt over into a new entity, U.S. Lite 'N Tender Brand Beef, Inc. (USLNTBB), which had been formed as the successor to Tend-A-Lean. However, Mesker refused to sign the note either individually or on behalf of Tend-A-Lean. The Jabaras also refused to sign the note as co-makers. Larry Steele signed the note in his capacity as secretary of USLNTBB; Klobuchar signed individually. Max Steele signed as a co-maker on behalf of Steele Cattle, Inc.
 
 
 35
 Larry and Max Steele, their wives, and Steele Cattle filed petitions in bankruptcy on March 10, 1988. During the middle or latter part of 1988, the Tribune Bank demanded payment on the renewed note. In December, Mesker, Klobuchar, and John Jabara paid a total of $102,652.10 to the bank. Steele Cattle made no payment on the note.
 
 
 36
 Mesker, Klobuchar, and the Jabaras subsequently filed a proof of claim with the bankruptcy court seeking payment pursuant to the indemnification agreement of February, 1987. The initial proof of claim, filed October 21, 1988, sought $495,962.64. By subsequent amendment, the claimants reduced the sum sought to $115,052.55.
 
 
 37
 The debtors objected to the proofs of claim. After a trial to the court on October 23-26 and December 4-5, 1990, the bankruptcy court allowed part of the claim advanced, finding that Max and Larry Steele were individually indebted to the claimants in the amount of $38,512.97 plus interest. The court also determined that Steele Cattle, Inc. was indebted to the claimants in the amount of $20,530.42.
 
 
 38
 Before the bankruptcy court, and in the present appeal, the Steeles contend that the indemnity agreement imposes responsibility only for those corporate obligations which they personally approved and executed. Further, they contend that the claimants perpetrated a fraud upon them by failing to fully reveal their knowledge of the precarious financial position of Tend-A-Lean.
 
 
 39
 In the brief to this court, the Steeles cite the 1986 and 1987 tax returns of Mesker and Klobuchar, which show extensive deductions for losses due to Tend-A-Lean's operations. Moreover, Mesker, Klobuchar, and the Jabaras have all acknowledged that Tend-A-Lean was losing money during 1986 and 1987.
 
 
 40
 Upon a review of the record, the court finds that the decision of the bankruptcy court should be affirmed. The bankruptcy court properly struck several of the various claims for contribution advanced by Mesker, Klobuchar, and the Jabaras. For example, the court disallowed contribution for Mesker and Klobuchar's $91,000.00 debt on behalf of Nutri-Way. As to the remaining claims, those which were allowed by the bankruptcy court, this court finds that the decision of the bankruptcy court was equally correct.
 
 Fraud
 
 41
 The Steeles contend that the bankruptcy court erred in failing to hold that the indemnification agreement was a product of fraud and therefore null and void as a matter of law. They contend that the claimants knew Tend-A-Lean was in serious financial trouble but deliberately failed to reveal this information. In the present appeal, the Steeles rely in particular on the 1986 and 1987 tax returns of Mesker and Klobuchar, which show substantial losses relating to Tend-A-Lean.
 
 
 42
 It is uncontradicted, however, that these tax returns were prepared well after the late-1986, early-1987 period in which the Steeles first became involved in Tend-A-Lean. The bankruptcy court properly concluded that there was no evidence of fraud on the part of the claimants. The Steeles have failed to demonstrate the elements of fraud.
 
 
 43
 There has been no showing by the Steeles of any knowing misrepresentations. Nor has there been proof by the Steeles that they justifiably relied on any statement or omission of the claimants. As the bankruptcy court found, the Steeles'
 
 
 44
 investment was made most casually and without any attempt to investigate [Tend-A-Lean] or its shareholders. Neither Larry nor Max is a neophyte in the cattle industry. They invested in the new venture with no financial information whatsoever from [Tend-A-Lean] and apparently without any independent inquiry of their own.
 
 
 45
 (Slip op. at 22.)
 
 
 46
 Far from being misled as to the prospects for Tend-A-Lean, Larry Steele has testified that he would expect any new venture in the cattle industry to experience losses during the first few years. Given the state of the record, the bankruptcy court did not err in concluding that the debtors had failed to establish by clear and convincing evidence that claims allowed were premised on misrepresentation and therefore voided by fraud on the part of the claimants. Nordstrom v. Miller, 227 Kan. 59, 65, 605 P.2d 545 (1980).
 
 The Nature of the Indemnity Agreement
 
 47
 The Steeles next contend that the bankruptcy court erred in determining that the indemnification agreement was ambiguous and therefore subject to interpretation through the use of parole evidence. They suggest that the indemnification agreement unambiguously creates an obligation only to contribute toward corporate obligations which they themselves have approved and signed. Unless they personally joined in the execution of a given loan agreement as a maker, co-maker, or guarantor, they cannot be forced to contribute towards the debt.
 
 The indemnification agreement provides:
 
 48
 1. Each of the parties hereto agrees that he will be individually responsible for all corporate obligations upon which such stockholder is individually responsible as maker, co-maker, guarantor, or otherwise, to the same percentage as his percentage ownership in Tend-A-Lean, Inc., and such percentage of ownership shall be determined by utilizing for each stockholder the number of shares issued and outstanding to such stockholder as the numerator and the total number of outstanding shares of Tend-A-Lean, Inc. as the denominator, and the fraction resulting shall be such stockholder's proportionate liability on any corporate obligation, and such stockholder shall in the event of default by the corporation and upon demand made by a lending institution, vendor or other holder of an account payable, forthwith contribute to such obligation such stockholder's proportionate share of such obligation as hereinabove described.
 
 
 49
 2. In the event that such stockholder shall default in the terms of this agreement, any stockholder who is required and does pay to a lending institution, vendor or holder of any other corporate payable a sum in excess of that stockholder's proportionate share as hereinafter determined, shall have an action against the remaining stockholders who have not so contributed to the extent of such stockholder's proportionate share of the obligation for any sum paid by such claiming stockholder in excess of his proportionate share as herein described.
 
 
 50
 (Slip op. at 28-29; emphasis added).
 
 
 51
 The bankruptcy court properly determined that the agreement was ambiguous. The agreement does not set forth the method by which losses are to be proportioned in the event that certain shareholders are insolvent, dead, or missing (as with Stephenson and Youngblood). The Steeles' position that they are responsible solely for debts which they directly approved and signed is contradicted by the effect of the contribution clause in paragraph 2, which provides that "any stockholder" paying more than his share is entitled to contribution. Moreover, paragraph 1 provides that contribution may be expected from a stockholder who is liable as a maker, co-maker, guarantor, "or otherwise." There is no indication in the agreement how the "or otherwise" language is to be interpreted. Since the agreement is ambiguous, the court properly resorted to parole evidence to determine the method of contribution. Hall v. Mullen, 234 Kan. 1031, 1037, 678 P.2d 169 (1984).
 
 
 52
 That evidence clearly demonstrates that it was the intent of the parties to divide the debts on an equal basis among solvent shareholders. Thus, in a January, 1988 letter, Larry Steele observed that "Youngblood and Stephenson are defunct so the remaining partners will have to ante up." The letter continues, stating that Larry and Max would "do our share" of paying off Tend-A-Lean's obligations.
 
 Burden of Proof
 
 53
 Under Bankr.R. 3001(f), a claim filed in substantial compliance with the bankruptcy rules is presumptively valid. See 11 U.S.C. § 502(a); In re Koontz Aviation, Inc., 71 B.R. 608, 610 (Bankr.D.Kan.1987). The burden is on the debtor to rebut the prima facie validity of the claim; when that occurs, the burden is on the claimant to demonstrate the validity of the claim by a preponderance of the evidence.
 
 
 54
 The Steeles contend that the bankruptcy court erred in placing upon them the burden to prove that the claims of Mesker, Klobuchar, and the Jabaras were invalid. The Steeles point out that the claimants' second proof of claim contained no attachments, merely a statement of the total figure supposedly owed. They then cite 8 Collier on Bankruptcy § 3001.05, which provides that under Bankr.R. 3001(f), the debtor has the burden of proof to demonstrate the invalidity of a claim if the claim "set[s] forth the facts necessary to support the claim."
 
 
 55
 This argument is without merit: the claimants submitted four proofs of claim during the history of the proceedings below, only one of which failed to contain supporting attachments. The Steeles provide no support for the suggestion that the failure to include attachments to the second proof of claim is a permanent, incurable defect which deprives the claimants of the presumption created by Rule 3001(f). To the contrary, the rule itself contains no such limitation. The other proofs of claim filed herein do comply with the rule, and the bankruptcy court correctly required the Steeles to controvert the prima facie validity of the claims raised in the subsequent proofs of claim.
 
 
 56
 In its opinion, the bankruptcy court dissected the various transactions for which the claimants sought contribution, allowing some of the claims and disallowing others. As to those claims which were allowed, the Steeles have failed to meet their obligation to rebut the presumptive validity of the claims. There is no indication in the record that the bankruptcy court abused its discretion in determining that the Steeles failed to meet the requisite burden of proof as to the allowed claims.
 
 
 57
 Steele Cattle, Inc.
 
 
 58
 The bankruptcy court granted claimants a judgment against Steele Cattle, Inc. in the amount of $20,530.42 plus interest.[2] This judgment arises from the guaranty agreement signed by Steele Cattle in connection with the Tribune Bank loan. The Steeles contend that Steele Cattle cannot be compelled to contribute, since it signed the agreement as a guarantor only, and not as a maker or co-maker.
 
 
 59
 Under the terms of the specific loan agreement at issue, however, all the signatories of the note and the guaranty agreement are jointly and severally liable for the payment of the debt. The bankruptcy court did not err in determining that, under the specific agreements involved herein, Steele Cattle is obliged to proportionally contribute its share of the Tribune Bank obligation.
 
 Prejudice
 
 60
 Finally, the Steeles contend that the bankruptcy court was prejudiced against them, and they cite as evidence various rulings made during the trial below, such as the exclusion of the tax returns of Mesker and Klobuchar as irrelevant. But, as noted earlier, these returns were prepared well after the Steeles' investment in Tend-A-Lean and demonstrate nothing as to Mesker's and Klobuchar's knowledge of the state of affairs of the corporation at the relevant time period.
 
 
 61
 Another passage cited by the Steeles occurs during the debtors' examination of Klobuchar during the trial:
 
 
 62
 Q. In regard to corporations in the State of Kansas, is it your understanding that normally, if you are a shareholder in a corporation, and the corporation loses money, that you cannot go to the other shareholders and ask for the right of contribution?
 
 
 63
 A. That's why we wrote the agreement we did, February 17.
 
 
 64
 THE COURT: I would ask you to answer the question, Mr. Klobuchar, not--
 
 
 65
 A. I'm sorry, Your Honor.
 
 
 66
 THE COURT:--not go beyond that.
 
 
 67
 (T.Tr., Vol. II, p. 395.)
 
 
 68
 This episode simply reflects a directive by the court for a witness to confine his answers to the question asked. In the various instances cited by the Steeles, there is simply nothing to suggest that the bankruptcy court was prejudiced against the Steeles, or that they failed to receive a fair trial of their objection to the proofs of claim.
 
 
 69
 A full review of the record fails to indicate any prejudice by the bankruptcy court against the debtors. To the contrary, the record reveals that the bankruptcy court carefully, and fairly, attempted to review all of the claims arising from the lean beef scheme.
 
 
 70
 IT IS ACCORDINGLY ORDERED this 28th day of May, 2992, that the decision of the bankrupcy court is hereby affirmed.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 The bankruptcy court allowed the claim against Steele Cattle, Inc., only in the alternative. The court found that claimants were entitled to recover a total of only $77,025.94, plus interest. If the claims against the Steeles' individual estates, in the amount of $38,512.97 each, were satisfied, claimants would have no claim against the bankruptcy estate of Steele Cattle, Inc.; if the individual bankruptcy estates did not satisfy the claims in the total amount, the claim against Steele Cattle's estate would be allowed
 
 
 [2]
 We note that Kansas law provides that a guaranty "is in the nature of a warranty by the guarantor that the thing guaranteed to be accomplished by the principal shall be done, and is not an engagement jointly with the principal to do the act." Iola State Bank v. Biggs, 662 P.2d 563, 567 (Kan.1983). The bankruptcy and district courts' findings as to Steele Cattle's liability do not affect that general proposition of Kansas law because the findings are based entirely on the terms of the specific note and guaranty agreement in this case. Under the specific contract terms involved in this case, Steele Cattle did, in fact, contract for primary liability on the obligation
 
 
 [1]
 Another, related corporation also existed during this time. Tend-A-Lean Feed Supplements, Inc. (TALFS) sold the feed supplement necessary for the lean beef concept. The bankruptcy court was unable to determine the principals of this corporation. TALFS continued to operate after the formation of Tend-A-Lean, but apparently vanished after Tend-A-Lean moved its assets to Wichita
 
 
 [2]
 This judgment was issued only in the alternative. The total claim allowed by the bankruptcy court totals $77,025.94. The judgment against Steele Cattle will take substance only if Larry and Max fail to pay the $38,512.97 which represents each brother's personal obligation on the claims advanced